AMOCO OIL COMPANY, WHITING REFINERY, Appellant–Respondent,

v.

COMMISSIONER OF LABOR, Board of Safety Review and OCAW, Local 7–1, Inc., Appellees–Petitioners.

No. 49A04–9810–CV–518.

Court of Appeals of Indiana.

April 18, 2000.

Douglas J. Heckler, Barnes & Thornburg, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Andrew L. Hedges, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellees.

## OPINION

RILEY, Judge

### STATEMENT OF THE CASE

Appellant–Respondent, Amoco Oil Company, Whiting Refinery (Amoco), appeals the trial court's order affirming the final decision of the Indiana Board of Safety Review (Board). The Indiana Department of Labor conducted an inspection at Amoco following an explosion at a propane truck loading facility, and the Commissioner of Labor (Commissioner) issued two safety orders [1] against Amoco as a result of the explosion. Amoco appealed the violations, and a hearing was held before an Administrative Law Judge (ALJ) who assessed penalties against Amoco. Amoco objected to the ALJ's findings and conclusions, but the Board affirmed the ALJ's decision. Amoco subsequently petitioned for judicial review to the Marion Superior Court, and that court sustained the Board's final order and entered judgment in favor of the Commissioner.

We affirm.

[1]. The two safety orders were issued on August 17, 1990. Safety Order No. 1 contained eight separate citation items, and Safety Order No. 2 contained eleven separate citation items. However, on March 6, 1992, the Commissioner amended the citation list so that Safety Order No. 1 still contained eight separate citation items, but Safety Order No. 2 contained only seven separate citation items.

## ISSUES

Amoco raises three issues for our review which we consolidate and restate as follows:

1. Whether the trial court erred in sustaining the Board's final order when the Board's order was based on hearsay.[2]

2. Whether the evidence was sufficient for the trial court to sustain the Board's final order that Amoco committed knowing violations of the General Duty Clause.

## FACTS AND PROCEDURAL HISTORY

On February 20, 1990, an explosion occurred at Amoco's Liquid Propane Gas (LPG) truck loading rack at its oil refinery in Whiting, Indiana, killing two Amoco supervisors and injuring four truck drivers on the scene. As a result of the explosion, the Building and Factory Safety Division of the Indiana Department of Labor/IOSHA conducted an inspection at the refinery from the date of the explosion until July 18, 1990. As a result of the inspection, the Commissioner of Labor issued Amoco two safety orders, each containing multiple items, assessing a total penalty of $118,000.00. On March 6, 1992, the Commissioner amended the citation list, grouped some items, and reduced the penalty to $78,000.00. Amoco petitioned for review of each of the safety orders, and the dispute was certified to the Indiana Board of Safety Review.

An ALJ for the Board conducted a hearing on the amended safety orders. The Commissioner presented his case on May 6, 7, and 13, August 4, and October 7, 8, and 9, 1992. Amoco presented its case in chief on March 15 and 16, April 22, 23, and May 17, 1993.

On February 18, 1994, the ALJ entered his findings of fact and conclusions of law, sustaining eleven (11) of the fifteen (15)

safety orders, and vacating four. On January 27, 1995, the Board adopted the ALJ's findings of fact and conclusions of law as its final decision.

On February 24, 1995, Amoco filed a Petition for Judicial Review to the Marion County Superior Court, asking the trial court to review the ALJ's findings as adopted by the Board. On September 11, 1998, the trial court heard oral argument. That same day, the trial judge entered his findings of fact and conclusions of law, ordering that the Board's action is sustained and entering judgment in favor of the Commissioner in accordance with the Board's final order. Amoco now appeals the trial court's order.

## DISCUSSION AND DECISION

### Standard of Review

Initially, we note our standard of review. When reviewing the decision of an administrative agency, this court stands in the same position as the trial court. *Palin v. Indiana State Personnel Dept.*, 698 N.E.2d 347, 350–351 (Ind.Ct.App.1998). On judicial review, a trial court may grant relief upon finding that the agency's action is: 1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; 2) contrary to constitutional right, power, privilege, or immunity; 3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; 4) without observance of procedure required by law; or 5) unsupported by substantial evidence. Ind.Code § 4–21.5–5–14. The trial court proceeding is not intended to be a trial de novo, but rather the court simply analyzes the record as a whole to determine whether the administrative findings are supported by substantial evidence. *Natural Resources Comm'n*

---

2. Amoco also argues that it was error to introduce the interview summaries because Amoco did not have an opportunity to cross-examine the interviewees. However, every interviewee, whose statement was included as an interview summary in the Joint Union Manage-

ment Accident Report, appeared on both Amoco's and the Commissioner's witness list in the hearing before the Board. Therefore, Amoco had an opportunity to call the interviewees as witnesses at the hearing.

v. *Sugar Creek Mobile Estates*, 646 N.E.2d 61, 64 (Ind.Ct.App.1995), *reh'g denied, trans. denied.* Courts that review administrative determinations, at both the trial and appellate level, review the record in the light most favorable to the administrative proceedings and are prohibited from reweighing the evidence or judging the credibility of witnesses. *Id.* Reviewing courts must accept the agency's findings of fact if supported by substantial evidence. *Id.* However, although a reviewing court owes some deference to an administrative agency's findings of fact, no such deference need be accorded an agency's conclusions of the law, as law is the province of the judiciary. *Indiana Dep't of Public Welfare v. Payne*, 622 N.E.2d 461, 465 (Ind. 1993), *reh'g denied.*

## I. *Agency Findings Based on Hearsay*

Amoco argues that the trial court erred by affirming the Board's order that Amoco knowingly violated certain safety standards because the Board's findings were based exclusively on hearsay. Specifically, Amoco contends that the interview statements contained in the Investigation Report do not satisfy the business records exception to the hearsay rule, and therefore, the alleged facts as set forth in these statements cannot be used to sustain a finding of a violation of the IOSH Act.

### A. *The Investigation Report*

As a result of the incident at the Whiting plant, Amoco formed a joint union-management committee to investigate the incident. The committee prepared an Investigation Report (Report) that was submitted to the ALJ under stipulation by both parties as a joint exhibit. Therefore, the Report was admitted into evidence on the basis that it was presented to the ALJ by stipulation of both parties. However, within the Stipulation to Admit Investigation Report as Joint Exhibit No. 1, Amoco specifically objected on hearsay grounds to the introduction of twenty-four (24) unsigned and unsworn interview summaries contained within the Report. Pursuant to

his Entry Concerning Joint Exhibit 1, the ALJ noted that the issue of the Report's admissibility was determined by stipulation and the only issue for him to determine with respect to the Report is what weight to accord the exhibit, and that determination turned on the issue of whether the Report is hearsay or an exception to the hearsay rule.

Within the Stipulation, the Commissioner specifically requested that the entire Report be admitted into evidence as a business record; an exception to the hearsay rule. The Commissioner argued that the Report was made in the routine course of Amoco's business, at or near the time of the events recorded, and was made by employees under a business duty to make the entries as a permanent record.

The ALJ considered the arguments of both parties and concluded regarding Joint Exhibit 1 that:

> ... the investigative report prepared by Amoco, with the participation of OCAW officials, qualifies as a business record exception to the hearsay rule.

> The investigative report appears to be the product of a conscientious effort to determine the cause of the explosion at the refinery that is the subject of these proceedings. As it is the Commissioner, and not Amoco, that wishes to rely on the report, the possibility of an underlying motive and opportunity to falsify the report is not an issue. Further, the reliability or trustworthiness of the statements it contains is enhanced by the fact that the statements were taken with both a Company and Union representative present.

> As the cases cited by the Commissioner demonstrate, investigative reports made in a context with this type of assurances of reliability qualify as business record exceptions to the hearsay rule. Accordingly, subject to the condition described below, Joint Exhibit 1 will be considered as an exception to the hearsay rule and the material therein, if

otherwise determined to be probative, may be used as the sole support of a finding. (A.R.451–452).[3] Essentially, the conditions set forth by the ALJ included a requirement that the Commissioner specify what portions of the numerous statements in the Report that he intended to use to establish the various items of the safety orders in order for the Report to be considered a hearsay exception; and to also identify those portions of the statements that the Commissioner intended to use as the sole support of a factual allegation.

### B. *Hearsay*

Under Ind.Code § 4–21.5–3–26 of the Administrative Orders and Procedures Act, an administrative law judge may allow hearsay statements into evidence. The admission of hearsay in an administrative action is not, however, without limitation. Pursuant to Ind.Code § 4–21.5–3–26, if hearsay evidence is properly objected to and does not fall within a recognized exception to the hearsay rule, the resulting order may not be based *solely* upon hearsay evidence. *Id.* (emphasis supplied). This codification of the common law "residuum rule" has been interpreted as requiring some corroborative evidence to support an administrative order when hearsay has been admitted over objection. *Hinkle v. Garrett–Keyser–Butler School Dist.*, 567 N.E.2d 1173, 1178 (Ind.Ct.App.1991), *trans. denied.* However, if not objected to, the hearsay evidence may form the basis for an order. *Id.*; Ind.Code § 4–21.5–3–26.

In this case, we find that the interview statements found within the Report do in fact contain double and triple hearsay. Further, Amoco made a proper objection that the statements within the Report are hearsay, and the Commissioner made a contention that the hearsay elicited falls within the business records exception to the hearsay rule. However, because we also find that the ALJ based his order upon evidence other than the hearsay statements, and thus not solely on hearsay evidence, we need not address whether the hearsay statements fall within the business records exception to the hearsay rule.

■ Notwithstanding their hearsay nature, the statement summaries are sufficiently reliable to be admissible in administrative proceedings because under Ind. Code § 4–21.5–3–26, an ALJ may allow hearsay statements into evidence. The ALJ found the summaries to be trustworthy and reliable, noting that such reliability or trustworthiness is enhanced by the fact that the statements were taken with both an Amoco and Union representative present. In fact, the portion of the Report at issue here (the accident report interview summaries) was submitted into evidence not by the party responsible for its preparation, Amoco, but by the opposing party, the Commissioner. Therefore, there is no possibility that the Report is affected by a self-exculpatory motivation by the party submitting the Report.

Furthermore, as a follow-up to the explosion that occurred at the Whiting plant, a joint union-management team was assigned by the Refinery Manager to investigate the facts and cause of the explosion and fire. The investigation was used to recreate and analyze the events leading up to and surrounding the incident in order to assist the ALJ and members of the Board of Safety Review to understand the facts and circumstances of the incident. The investigation began immediately after the incident and included interviews of truck loading rack operators, fire crewmembers, and truck drivers. (A.R.5255–5257). In addition to their use by the investigation team in making the Report to provide a

---

**3.** In this case, we will refer to the Record from the hearing before the ALJ for the IOSHA Board of Safety Review as "A.R." That Record is comprised of thirty (30) bound volumes. We will refer to the Record from the trial before the Marion Superior Court as "R." That Record is comprised of three volumes of the "Record of Proceedings" and one volume of a "Supplemental Record of Proceedings."

better understanding of the facts and circumstances surrounding the explosion and fire, the interview summaries were of utility to Amoco and were relied upon extensively to ascertain how and why the accident occurred in order to prevent future similar accidents. Therefore, we find the purpose and practice of the investigation team's formation and investigation to be sufficient indicia of trustworthiness to establish the admissibility of the interview summaries as hearsay.

■ However, Amoco did not object that the entire Report amounts to hearsay; but instead, Amoco only objected on hearsay grounds to the accident report interview summaries. In fact, in the Stipulation, Amoco stated:

> While the parties stipulate to the admissibility of this report as a relevant document, Respondent Amoco Oil Company *specifically* objects to the interview statements contained in the report as documents that contain hearsay ...

(A.R.266) (emphasis supplied). Thus, because the Joint Investigative Report as a whole was not objected to on hearsay grounds, even if the entire Report amounts to hearsay evidence, it may form the basis for an administrative order. *Hinkle*, 567 N.E.2d at 1178; Ind.Code § 4–21.5–3–26. Nevertheless, the entire Report does not amount to hearsay evidence, and provides independent support for the ALJ's Order, irrespective of the hearsay statements.

First, the joint Union–Management team concluded that the explosion was caused by errors in which pure oxygen was delivered, connected, and subsequently introduced into the loading rack odorant storage vessel. Specifically, the committee found and reported that:

> The oxygen clusters involved were mistakenly delivered to the LPG truck site on February first and second by a contract labor crew. The labor crew was assigned to deliver nitrogen clusters, but mistakenly picked up oxygen clusters from the storehouse. This crew did not check the contents of the cylinders that they picked up, nor did they connect them to the system. Oxygen and Nitrogen clusters were stored in a common area at the refinery storehouse.

> The laborers who delivered the bottles to the truck site were directed to deliver, and thought they were delivering, nitrogen clusters, but two of the three clusters of cylinders as confirmed by laboratory analyses, contained 99.9% oxygen.

(A.R.5263, 5258).

Second, the investigation team concluded that on February 19th, someone mistakenly connected one of these clusters of oxygen cylinders to the odorant pressurizing system after removing special fittings that were made to avoid such a connection. Specifically, the committee found that:

> Operator [Skip] Barath also recalls having noticed sometime after the clusters were delivered by the Navarro laborers, that one cluster had the wrong fittings, both male fittings. (A female fitting is required to match up with the male fitting on the nitrogen regulator). Furthermore, Mr. Barath testified that he had contacted [Amoco supervisor] Del Flores via radio pager that the cluster had the wrong fittings and that Mr. Flores acknowledged him and said that he (Del Flores) would "take care of it." Mr. Barath testifies that he never realized that the cluster contained oxygen.

> The committee concludes that sometime after the delivery to the site, one female fitting off of nitrogen cylinder Bank No. 2 was interchanged with one male fitting off of oxygen cylinder Bank No. 1. This in-turn allowed the nitrogen regulator to be connected to the oxygen cluster. There is evidence to indicate that this relocation was accomplished using a pipe wrench. The committee concludes that this interchange most probably occurred on February 19th, and that oxygen was first connected and introduced into the odorant system at that time. Loading records indicate that on the 19th a total

of 2 trucks were loaded on the 11 p.m. to 7 a.m. shift, 5 trucks were loaded on the 7 a.m. to 3 p.m. shift, and 3 trucks on the 3 p.m. to 11 p.m. shift. One truck was loaded on the 11 p.m. to 7 a.m. shift February 20th.

(A.R.5260).

Finally, the Report contained the committee's technical conclusion as to the cause of the explosion. Specifically, the committee concluded that:

At the time of the February 20th explosion, Amoco supervisors Del Flores and Rich Misiolek were troubleshooting problems with the odorant injection system. In this effort they had vented the odorant injection system. Because the oxygen cylinders were connected to the system, nitrogen in the odorant storage vessel was automatically replaced with oxygen. The oxygen began to react with the liquid mercaptan raising its temperature and developing a flammable vapor space. This vapor space was ignited either by pyrophoric/ catalytic deposits in adjoining lines or by hot particles swept into the vessel by the oxygen.

(A.R.5255).

Therefore, although the Joint Investigation Report did contain hearsay statements, the Report also contains extensive evidence of the results of Amoco's logs, records, and laboratory analyses completed before, during, and after the explosion, which were relied upon for the committee's conclusions, and which in-turn provided independent support for the ALJ's Order, irrespective of the hearsay statements.

## II. *Sufficiency of Evidence*

■ Next, Amoco challenges the sufficiency of the evidence that supports the Board's determination that Amoco knowingly violated its general duty to protect its employees. The general duty clause provides:

Each employer shall establish and maintain conditions of work which are reasonably safe and healthful for employ-

ees, and free from recognized hazards that are causing or are likely to cause death or serious physical harm to employees.

Ind.Code § 22–8–1.1–2. To prove a knowing violation, the Commissioner of Labor is required to prove that Amoco acted voluntarily, with either an intentional disregard of, or plain indifference to, its employees. *Union Tank Car, Fleet Operations v. Commissioner of Labor,* 671 N.E.2d 885, 890 (Ind.Ct.App.1996), *trans denied.*

The Commissioner of Labor issued four knowing violations of the general duty clause against Amoco, including: 1) Safety Order No. 2, Item 2: no qualified individual at the liquid propane gas loading rack; 2) Safety Order No. 2, Item 4: not locking the padlocks on the compressed gas cylinder storage racks; 3) Safety Order No. 2, Item 6: failure to orientate contract truck drivers; and 4) Safety Order No. 2, Item 7: failure to segregate compressed gases.

■ Safety Order No.2, Item 2 states that:

IC 22–8–1.1 Section 2: The employer did not furnish a place of employment which was free from recognized hazards that were causing or likely to cause death or serious physical harm to employees:

LPG Loading Rack – The employer did not ensure that qualified competent individuals were available at the point of transfer during the truck drivers' operation of the Loading Rack facility in order to handle emergencies and monitor the condition of the transfer system. Among other methods, one feasible and acceptable abatement method to correct this hazard is to (1) ensure the availability of qualified, competent individuals to handle emergencies and monitor the condition of the transfer system during the truck drivers' operation of the loading rack facility; and (2) ensure that truck drivers are adequately trained to contact readily accessible, qualified, competent individuals such as that set

forth in the employer's own programs and NPGA Operatïng Procedures Guide Book Number 4002, Chapter 13. (A.R.85–86).

The evidence supports the Board's finding that Amoco did not ensure that a competent person was present at the Whiting loading rack at all times during transfer. Amoco's failure to have an assigned, qualified individual present at the point of transfer during the entire operation to handle emergencies and monitor the condition of the transfer system at the LPG loading rack was a voluntary, conscious choice made with plain indifference to the welfare of its employees, and violated Ind. Code § 22–8–1.1–2.

The National Propane Gas Association (NPGA) Operating Procedures Guide Book Number 4002, Chapter 13, upon which the Commissioner references as a method of abatement for this particular violation states that: "a qualified person must be present at the transfer point during the entire operation to handle emergencies and monitor the condition of the transfer system." (A.R.1869). Amoco operators are considered "qualified persons," however, the contract truck drivers described situations in which Amoco employees were not present during the loading of trucks at the LPG rack, and were unavailable for substantial periods of time. Although the contract truck drivers employed by Amoco could be considered "qualified persons," thereby dispensing with the need for an Amoco employee to be present during loading, the evidence reveals that Amoco failed to provide proper training to all the truck drivers despite Amoco's recognition that necessary training of the contract truck drivers should be provided. Furthermore, the evidence reveals that Amoco in fact recognized the absence of a competent person at the loading rack as a hazard because transfer operations are considered to be one of the most hazardous operations in the petrochemical industry.

Amoco's recognition of the absence of a competent person at the loading rack as a hazard, and the recognition that it should provide contract drivers with the necessary training in order for them to serve as "qualified persons" is evidence that Amoco was aware of the hazardous condition and knew of possible abatement methods. The fact that competent individuals were absent at the loading rack during transfer and all truck drivers were not properly trained is evidence that Amoco made a voluntary conscious choice representing a "plain indifference" to its employees' safety. Therefore, the violation is supported by substantial evidence.

■ Safety Order No. 2, Item 4 states that:

IC 22–8–1.1 Section 2: The employer did not furnish a place of employment which was free form [sic] recognized hazards that were causing or likely to cause death or serious physical harm to employees in that:

Stores Area – The pad locks on the storage rack for the compressed gas cylinders were not locked, allowing free access to the cylinders which could result in improper use of gases and cause explosions. Among other methods, one feasible and acceptable abatement method to correct this hazard is to develop and implement procedures to control the accessibility to the compressed gas cylinders by only persons who are properly trained to handle and use compressed gases such as that stipulated by CGA Pamphlet P–1–1984, Section 3.6.1.

(A.R.86–87).

The evidence supports the Board's finding that Amoco violated the general duty clause by not locking the padlocks on its storage rack for compressed gas cylinders, thus allowing free access to the cylinders. Amoco's failure to limit access to the gas cylinders because it was more convenient to leave the area unlocked, created the risk of unauthorized and untrained persons mishandling the compressed gases constituting a plain indifference to a dangerous condition, in violation of Ind.Code § 22–8–

1.1–2. As a feasible, economical and acceptable method of abatement, the Commissioner stated that Amoco should develop and implement procedures to control the accessibility to compressed gas cylinders to only those persons who are properly trained to handle and use compressed gases.

The Compressed Gas Association (CGA) Pamphlet P–1–1984, Section 3.6.1, upon which the Commissioner references as a method of abatement for this particular violation states that: "3.6.1 Trained Personnel. Compressed gases shall be handled and used only by properly trained persons." (A.R.1464).

The evidence reveals that the gas cylinders at the stores area are stored in a cage, approximately twenty-five (25) feet long and six feet deep. Separate compartments exist for each type of gas, each of which has a hinged door. The cages were all marked with the name of the gas and a designation of "full" or "empty." A rod goes through the handles of the compartments and the rod has a place for a padlock to be placed on it. However, at the time of the inspection at the plant, the rod was not padlocked, and the evidence reveals that the cylinder storage rack was routinely left unlocked. Amoco employee William Early, who was the union representative at the hearing and the union representative involved in the Joint Accident Report, testified that it would be feasible to assign a person to the stores area to control access to the cylinders on a twenty-four (24) hour basis, thereby requiring employees to sign for cylinders and a stores employee to unlock a padlock to allow the cylinder to be taken.

Given the potentially disastrous implications of unauthorized and untrained personnel mishandling the compressed gases, Amoco's failure to limit access or control to the gas cylinders, with no check on the identity of persons delivering or picking up gas cylinders from this area, because it was more convenient to leave the area unlocked, constitutes a plain indifference to a dangerous condition. Therefore, the violation is supported by substantial evidence.

■ Safety Order No. 2, Item 6 states that:

IC 22–8–1.1 Section 2: The employer did not furnish a place of employment which was free from recognized hazards that were causing or likely to cause death or serious physical harm to employees:

LPG Loading Rack Area – The contracted LPG bulk truck drivers were not being properly orientated by the employer to use the dual propane loading system with automatic odorant injection. Among other methods, one feasible and acceptable abatement method to correct this hazard is to enforce the company policy that individual drivers must be trained in loading procedures and must satisfy the terminal supervisor that they are qualified to load safely and in accordance with all terminal instructions such as that stipulated in the Instructions to Drivers for LPG Key Stop Loading And Driver Loading Booklet.

(A.R.23).

The evidence supports the Board's finding that Amoco violated the general duty clause by failing to properly orient LPG bulk truck drivers in the use of the dual propane loading system with automatic odorant injection. Although Amoco provided little or no training to visiting contract truck drivers, it allowed the drivers unrestricted access to the worksite and the hazardous chemicals stored thereon, thereby creating the risk of an explosion or fire resulting from the mishandling of highly combustible hazardous materials by untrained contract truck drivers.

The Instruction to Drivers for LPG Key Stop Loading And Driver Loading Booklet, upon which the Commissioner references as a method of abatement for this particular violation states that: "Individual drivers must be trained in loading procedures and must satisfy the terminal super-

visor that they are qualified to load safely and in accordance with all terminal instructions." (A.R.1155).

The evidence reveals that although Amoco recognized the need to familiarize contract truck drivers with the safety procedures to be followed at the loading rack and that the training of contract truck drivers was an objective, Amoco failed to train the contract truck drivers on operational and safety matters relevant to its loading rack. Furthermore, Amoco's supervisory personnel were aware that contract truck drivers learned to turn to each other for help in the loading process at Amoco's facility rather than seeking assistance from Amoco's employees.

The failure to train contract truck drivers on specific safety procedures required for Amoco's loading rack presented a serious risk that untrained drivers could cause an uncontrolled release of flammable liquids and vapors causing serious injury or death. By ignoring its own procedures, Amoco acted with plain indifference to the safety of its employees because the transfer of petrochemicals is one of the most dangerous activities in the petrochemical industry. Therefore, there is substantial evidence to support this violation.

■ Safety Order No. 2, Item 7 states that:

3.3.3. 29 CFR 1910.101(b): Section Compressed Gas Association Pamphlet P–1–1965, as adopted by 29 CFR 1910.101(b): compressed gases of different types were not grouped by types of gas where stored at the same location:

(a) LPG Loading Rack – Two clusters of 12 oxygen cylinders and one cluster of 12 nitrogen cylinders were stored at the LPG loading rack site without being separated or grouped as to type of gas.

(b) Stores Area – Gas cylinders of oxygen were stored together with compressed gas cylinders of nitrogen and were not grouped separately as to type of gas.

(c) Stores Area – On or about February 21, 1990, a representative of the Joint Union Management Committee observed 8 cylinders of hydrogen stored together with oxygen cylinders.

(A.R.25).

The evidence supports the Board's finding that Amoco violated the general duty clause by failing to segregate compressed gases of different types both at the LPG rack and in the stores area adjacent to the cage, in violation of 29 CFR § 1910.101(b), Section 3.3.3 of CGA Pamphlet P–1–1965.

29 CFR 1910.101(b): Section 3.3.3. Compressed Gas Association (CGA) Pamphlet P–1–1965, as adopted by 29 CFR 1910.101(b), which the Commissioner references as a method of abatement for this particular violation states that:

3.3.3. Where gases of different types are stored at the same location, cylinders should be grouped by types of gas, and the groups arranged to take into account the gases contained, e.g. flammable gases should not be stored near oxidizing gases.

(A.R.1556).

The evidence reveals that two clusters of oxygen cylinders and one cluster of nitrogen cylinders were stored at Whiting's LPG loading rack without being separated or grouped as to the type of gas. In the stores area, oxygen cylinders were being stored with nitrogen cylinders, and hydrogen cylinders were being stored with oxygen cylinders. Amoco argues that it was unaware that oxygen clusters were being stored at the LPG rack. However, no Amoco supervisor or employee identified the clusters as oxygen clusters although the oxygen clusters were at the LPG rack for more than two weeks before the explosion on February 20, 1990. The clusters were not identified as containing oxygen because it was assumed that they were nitrogen clusters, because only nitrogen clusters were supposed to be present at the LPG rack. Thus, the oxygen clusters were mistakenly taken to the LPG rack

because they were improperly mixed at the stores location with nitrogen clusters in an area that was not designated by Amoco for a particular type of gas and was not monitored by Amoco to assure that only nitrogen was present. Amoco's own safety manual requires that compressed gas cylinders be segregated by type of gas; however, Amoco did not segregate compressed gases by type when it stored them in the stores area or the LPG rack area.

The failure to segregate the gases by type presented the possibility that incompatible gases could be mixed, resulting in a fire or explosion. Amoco knew of its obligation to segregate gases by type because it properly segregated gases by type and designated each area in the cage. However, Amoco's failure to properly segregate gases by type at the LPG rack and the stores area led to the misidentification of oxygen for nitrogen and the use of oxygen instead of nitrogen, causing an explosion that killed two people and injured four others. Amoco's failure to segregate the cylinders by type of gas at the LPG rack and in the stores area is a violation of 29 CFR 1910.101(b), and constitutes a plain indifference to its employees' safety. Therefore, there is substantial evidence to support this violation.

## CONCLUSION

The trial court properly sustained the Board's final order because the Board's order was not based solely on the hearsay evidence of the interview summaries found within the Report. The evidence was sufficient for the trial court to sustain the Board's final order that Amoco committed four knowing violations of the General Duty Clause.

Affirmed.

KIRSCH, J., and SHARPNACK, C.J., concur.