William F. PENDLETON, Appellant-Petitioner,

v.

Sally McCARTY, Commissioner of Insurance, Indiana Department of Insurance, State of Indiana, Appellees-Respondents.

No. 53A04-0009-CV-385.

Court of Appeals of Indiana.

April 30, 2001.

**58**

Edgar R. Lantis, Dickinson, Abel & Lantis, Carmel, Indiana, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Jon Laramore, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BAILEY, Judge

### Case Summary

William F. Pendleton ("Pendleton") appeals the trial court's decision affirming the Commissioner of Insurance ("Commissioner")'s Final Order revoking Pendleton's two insurance agent licenses for three years. We affirm.

### Issues

Pendleton raises several issues, which we consolidate and restate as:

I. Whether the Commissioner's Final Order was based on insufficiently ascertainable standards such that it was arbitrary, capricious and an abuse of discretion, and deprived Pendleton of Due Process;

II. Whether Pendleton's disciplinary sanction was disproportionate to sanctions imposed on other agents, depriving him of his Equal Protection rights;

III. Whether the revocation of both Pendleton's insurance licenses was beyond the statutory jurisdiction and authority of the Commissioner;

IV. Whether Pendleton's conduct was judged against the wrong evidentiary standard;

V. Whether the administrative proceeding failed to conform to appropriate procedures; and

VI. Whether the Commissioner's decision is supported by sufficient evidence.

### Facts and Procedural History

In May 1996, Roberta Murphy ("Murphy") contacted Pendleton, who at that time was a licensed insurance agent under contract with State Farm Insurance Company, to discuss her desire to consolidate her various insurance policies with one agent. Murphy had recently learned that her homeowner's insurance policy would not provide liability coverage for a home office she had constructed, and that her auto insurance rates would be raised. Pendleton suggested a State Farm homeowner's policy with the requested liability protection, and also recommended that Murphy meet with a State Farm life insurance specialist, which she did. Pendleton, however, advised Murphy that she did not qualify for standard State Farm auto coverage and that she would have to obtain a "high risk" policy.

Pendleton discussed Murphy's auto insurance needs with Starla Johnson ("Johnson"), an independent agent unaffiliated

with State Farm. Johnson had her own agency, which was located next-door to Pendleton's State Farm office. Johnson told Pendleton that one of the companies she represented could provide Murphy with an auto policy. Pendleton brought Johnson to Murphy's home to discuss Murphy's auto insurance needs. On the way, Pendleton explained to Johnson that Murphy was his client, and that to avoid any confusion on Murphy's part, he would introduce Johnson as his "associate." At some point during the meeting, Murphy executed an application for an auto policy through Gallant Insurance Company, an insurer unrelated to State Farm. Johnson had minimal conversation with Murphy. Murphy presumed that Gallant was affiliated with State Farm, and that Johnson was associated with Pendleton's State Farm agency. She believed, from speaking with Pendleton, that after her policy with Gallant had been in effect for one year, she would no longer need a "high risk" policy, and would be eligible for a standard State Farm policy.

Gallant subsequently issued Murphy an auto insurance policy, and sent a copy of the policy to Johnson to be delivered to Murphy. The policy listed Johnson's name and address in a section on the upper right corner of the document. Upon Pendleton's suggestion, Johnson gave the policy to Pendleton's office so that Pendleton could deliver it to Murphy when he delivered her State Farm policies. Pendleton personally delivered the Gallant auto policy to Murphy. The sections of the policy bearing Johnson's name and address, however, had been covered up by someone at Pendleton's agency with stickers that listed Pendleton's name and address, and identified him as a State Farm agent. In addition, post-it notes with the words "State Farm Car Finance Plan" were also affixed to the policy. The policy, however, described itself as that of "Gal-

lant Insurance Company—A Member of Warrior Insurance Group, Inc." One of the post-it notes instructed Murphy to make her premium checks payable to Gallant Insurance Company. Murphy made all of her premium payment checks out to Gallant, and sent her payments to Gallant.

When Murphy needed to speak with Johnson about her auto coverage, she would call Johnson at Pendleton's office. Pendleton's staff would go next-door to Johnson's agency and retrieve her for calls. When Johnson asked Pendleton's staff to have Murphy telephone Johnson at her own office, Pendleton's staff advised that Pendleton would be more comfortable if Johnson took Murphy's calls in Pendleton's office. Pendleton explained to Johnson that it would be less confusing for Murphy if she could simply direct all of her calls to one number upon the understanding that "everything was there in one office."

Approximately one year after obtaining the Gallant policy, Gallant sent Murphy a policy renewal notice. Murphy called Pendleton to determine whether she was eligible for a standard State Farm policy, and whether she should renew her Gallant policy. At some point, Pendleton asked Murphy to provide him with documents related to auto insurance she had prior to being covered by Gallant, which would assist him in determining whether Murphy qualified for a State Farm policy. Pendleton also advised Murphy to pay her Gallant renewal premium to ensure that she was covered in the event that Pendleton could not secure a State Farm policy for her. Murphy paid the Gallant premium. Pendleton subsequently advised Murphy that she was eligible for a State Farm auto policy. Murphy was leaving the country and arranged for Pendleton to come to her house while she was away and obtain a check for the State Farm policy premium from Mur-

phy's husband. Murphy's husband accordingly paid the premium to Pendleton.

When Murphy returned, she learned that the State Farm premium was even higher than the premium for the "high risk" Gallant policy. She called Pendleton to express her concern, but was advised that he was on vacation. She then asked to speak with Johnson, and was told for the first time that Johnson worked in a separate agency. She obtained Johnson's number and called her, expressing surprise and confusion that Johnson was not a State Farm agent in Pendleton's agency. Johnson was surprised at Murphy's confusion, largely because she assumed the Gallant policy had been delivered to Murphy with Johnson's information listed, rather than Pendleton's stickers. Johnson surmised that Pendleton feared that if Murphy knew Johnson was a separate agent, Murphy might take the rest of her insurance business to Johnson and away from Pendleton.

Murphy eventually transferred her insurance matters to another State Farm agent, and filed a complaint about Pendleton to the Indiana Department of Insurance ("IDOI"). IDOI notified Pendleton about Murphy's complaint on August 7, 1997, and Pendleton responded by letter on August 29, 1997. IDOI filed its Statement of Charges against Pendleton on February 13, 1998, alleging, among other things, that Pendleton deceived Murphy as to the relationship between State Farm and Gallant, and between Johnson and Pendleton's State Farm agency. On March 4, 1998, Pendleton attended an informal conference with an IDOI representative to discuss the charges, and on March 9, 1998, IDOI offered to drop its charges in exchange for Pendleton's agreement that his conduct was wrongful, his payment of a $750.00 fine, and his placement on administrative probation for four months. Pendleton declined, and the matter proceeded to hearing on November 13, 1998.

The administrative law judge ("ALJ") issued her Findings of Fact, Conclusions of Law, and Recommended Order on April 16, 1999. Among the ALJ's numerous findings of fact were the following:

30. [Pendleton] deliberately misled Murphy as to Johnson's affiliation with State Farm, through introduction of her as an associate and directing telephone calls to Johnson to go through his office.

31. Although no one observed [Pendleton] affix the sticker that covered Starla Johnson's name to the Gallant policy, he had access to the stickers and was the last person to handle the Gallant policy. Respondent either affixed the stickers himself or was aware they were on the Gallant policy and delivered it anyway. Either scenario is a deliberate attempt to mislead Murphy as to the identity of her insurer and her insurance agent.

(R. 14.) The ALJ concluded that this deliberate deception violated Indiana Code section 27–1–15.5–8(a)(9), which prohibits, among other things, dishonest practices by insurance agents. The ALJ recommended that the Commissioner revoke Pendleton's two insurance licenses, denominated as "C–2104310" and "O–2104300," for three years. After extensive briefing by both parties, the Commissioner entered her Final Order on September 27, 1999, adopting the ALJ's findings of fact, conclusions of law, and recommendation to suspend Pendleton's licenses for three years.

Pendleton filed his Verified Petition for Judicial Review in the Monroe County Circuit Court on September 28, 1999. The trial court affirmed the Commissioner's Final Order on September 5, 2000. Pendleton now appeals.

## Discussion and Decision

### A. Standard of Review

When reviewing an administrative agency's decision, appellate courts stand in the same position as the trial court. *Amoco Oil Co. v. Commissioner of Labor,* 726 N.E.2d 869, 872 (Ind.Ct.App. 2000). Under the Administrative Orders and Procedures Act ("AOPA"), a court may reverse an agency's decision only if:

> (d) The court ... determines that a person seeking judicial relief has been prejudiced by an agency action that is:
>
> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) contrary to constitutional right, power, privilege, or immunity;
>
> (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (4) without observance of procedure required by law; or
>
> (5) unsupported by substantial evidence.

IND. CODE § 4–21.5–5–14(d). The party seeking judicial review bears the burden to demonstrate that the agency's action is invalid. IND. CODE § 4–21.5–5–14(a). The trial court proceeding is not intended to be a trial *de novo,* and review at both the trial and appellate level is limited to the issues set forth in the AOPA. *See Amoco Oil Co.,* 726 N.E.2d at 873. Reviewing courts must consider the record in the light most favorable to the administrative proceedings, and may not reweigh the evidence or assess the credibility of witnesses. *Id.* Moreover, a reviewing court may not reverse for errors that are nonprejudicial or harmless. IND. CODE § 4–21.5–5–14(d); *Indiana State Board of Embalmers and Funeral Directors v. Kaufman,* 463 N.E.2d 513, 520 (Ind.Ct.App.1984).

### B. Insurance Agent Conduct and IDOI Enforcement

Indiana Code section 27–1–15.5–8 provides, in part, as follows:

> (a) The commissioner may suspend, revoke, refuse to continue, renew, or issue any license issued under this chapter, or impose any of the disciplinary sanctions under subsection (e) if, after notice to the licensee and to the insurer represented at the hearing, the commissioner finds as to the licensee any one (1) or more of the following conditions:
>
> . . .
>
> (9) In the conduct of the licensee's affairs under the license, the licensee has used fraudulent, coercive, or dishonest practices, or has shown himself to be incompetent, untrustworthy, or financially irresponsible, or not performing in the best interests of the insuring public.
>
> . . .
>
> (e) The commissioner may impose any of the following sanctions, singly or in combination, when it finds that a licensee is guilty of any offense under subsection (a):
>
> (1) Permanently revoke a licensee's certificate.
>
> (2) Suspend a licensee's certificate.
>
> (3) Censure a licensee.
>
> (4) Issue a letter of reprimand.
>
> (5) Place a licensee on probation status. . . .

### C. Analysis

#### 1. Standards Governing the Commissioner's Discretion

Pendleton claims that revocation of his insurance licenses on the basis of the Commissioner's conclusion that Pendleton had

engaged in dishonest practices was arbitrary, capricious, and an abuse of discretion, and deprived him of due process of law. According to Pendleton, Indiana Code section 27–1–15.5–8(a)(9)'s prohibition against a variety of conduct including "dishonest practices" is vague and ambiguous and grants the Commissioner unfettered subjective discretion to decide what conduct is unacceptable. He further complains that the Commissioner's discretion to select an appropriate penalty under 27–1–15.5–8(e) is equally unguided, rendering the Commissioner's imposition of penalties under that provision defective. He particularly faults the Commissioner for failing to promulgate specific regulations to govern determinations under Indiana Code sections 27–1–15.5–8(a)(9) and –8(e).

Pendleton is correct that administrative decisions generally must be based upon ascertainable standards so that agency action will be orderly and consistent. *Clarkson v. Department of Ins.*, 425 N.E.2d 203, 207 (Ind.Ct.App.1981). These standards should be stated with sufficient precision to provide those having contact with the agency fair warning of the criteria by which their actions will be judged. *Id.* This Court considered and rejected arguments similar to the one raised by Pendleton with regard to Indiana Code section 27–1–15.5–8(a)(9) in *Clarkson.* In that case, we noted that "where standards are stated with sufficient precision in the statute itself, it is not necessary for the administrative agency to provide additional clarification and specificity so long as such standards give adequate warning to those having potential contact with the agency." *Id.* at 207–208.

■ In this case, the statute at issue proscribes "dishonest practices" conducted by an insurance agent "under the [agent's] license." The court in *Clarkson* specifically held that the phrase "under the

[agent's] license" conveyed "an admonition to the licensee that the enumerated practices must relate to activities for which he has sought and received a license," and was sufficiently clear to be understood by agents. *Id.* at 208. We conclude that the meaning of the phrase "dishonest practices" is equally certain. The phrase clearly refers to practices involving untruthfulness or deception. These terms are not so relative or ambiguous that a person of common understanding would be unable to accurately identify dishonesty when he or she sees it. When read in conjunction with the term "under the license," the prohibition against "dishonest practices" plainly advises insurance agents, including Pendleton, that they will be subjected to discipline if they engage in such practices while conducting activities for which they are licensed.

Pendleton was equally on notice of the various penalties to which he could be subjected if he engaged in the conduct prohibited by the statute. These penalties range from the most severe, permanent license revocation, to what appears to be the least serious, the issuance of a letter of reprimand, with several levels of sanctions between. The statute clearly gives the Commissioner the discretion to select an appropriate penalty for particular misconduct. While that discretion is not limitless, *cf. Indiana Dept. of Envtl. Mgmt. v. Medical Disposal Services, Inc.*, 729 N.E.2d 577, 582 (Ind.2000) (noting that penalty for violation of environmental regulations should reflect principles underlying purpose of Environmental Management Act and the gravity of the infraction), we noted in *Clarkson* that the Commissioner is not obligated to explain why a particular penalty is imposed. 425 N.E.2d at 207. As we explained in *Clarkson,* we "will not attempt to substitute [our] opinion for that of an agency concerning mat-

ters within the scope of that agency's discretion and authority." *Id.*

### 2. Consistency of Sanction with Penalties in Other Cases

■ Pendleton's most specific claim regarding his penalty is that it was so disproportionate to penalties imposed on other agents for violations of the same statute that it was arbitrary and capricious and denied him equal protection under the law. Pendleton correctly notes that in general, the equal protection provisions of the United States and Indiana Constitutions, U.S. CONST. amend. XIV, § 1, and IND. CONST. art. I, § 23, require that similarly situated persons be treated the same under the law. *See Cunningham v. Aluminum Co. of America,* 417 N.E.2d 1186, 1192 (Ind.Ct. App.1981). Pendleton presented the trial court with documents purporting to list agents who had been penalized by the Commissioner, along with the penalties they received. He claims that these documents show that he received a harsher penalty than other agents who committed the same offenses. The documents, however, do not support this contention.

The documents indicate that the penalties imposed on the individuals listed ranged from written reprimands to permanent license revocations. Most of the listings fail to disclose what statutory provision was violated. For those that do identify the particular provision in question, there is no indication whatsoever as to the nature of the offense. It was therefore impossible for the trial court, and is impossible for this Court, to determine whether Pendleton was similarly situated to the other disciplined agents by virtue of the nature of their conduct, and there is thus no basis upon which to conclude that Pendleton was treated differently than other similarly situated agents. These documents similarly fail to support Pendleton's assertion that the penalty was disproportionate and therefore arbitrary and capricious.

Pendleton's dissatisfaction appears to stem in no small part to the fact that his ultimate penalty—the three-year suspension of both of his licenses—was considerably harsher than the deal offered him by the IDOI prior to the hearing. Pendleton points to no authority suggesting either that an administrative agency is required to impose the same or similar penalty after a hearing as it offered ·in settlement prior to the hearing, and he fails to explain why we should create such a requirement here.

■ In a related argument, Pendleton claims that even if his penalty was not impermissible under the terms of the AOPA, the revocation of his licenses for three years was "manifestly unreasonable" and should be revised upon appeal as if it were a criminal sentence. *See Evans v. State,* 725 N.E.2d 850 (Ind.2000) (vacating "manifestly unreasonable" sentence). Although creative, this claim is not persuasive. The authority of appellate courts to revise sentences found to be manifestly unreasonable in light of the nature of an offense and the character of the offender, derived from sections 4 and 6 of article 7 of the Indiana Constitution, and from Appellate Rule 7(B), is limited to criminal cases and has no application in administrative matters. As this Court stated in *City of Indianapolis v. Woods,* 703 N.E.2d 1087, 1091 (Ind.Ct.App.1998), "[t]he reviewing court may not substitute its judgment for that of the administrative body or modify a penalty imposed by that body in a disciplinary action, without a showing that such action was arbitrary and capricious."

### 3. Suspension of Both Licenses

■ Pendleton further argues that the suspension of both his auto insurance license and his life insurance license exceed-

ed the Commissioner's jurisdiction and authority because Pendleton was never placed on notice that his life insurance license was at issue. This is clearly not the case. The first paragraph of the IDOI's Statement of Charges alleged that Pendleton "is a licensed insurance agent, duly licensed by the State of Indiana, holding license numbers O–21043000 and C–2104310." (R. 39.) One of these numbers relates to Pendleton's life insurance license, and one refers to his auto insurance license. The Charges asked the Commissioner to "take any and all appropriate disciplinary action with respect to the insurance licenses held by [Pendleton], including but not limited to suspension or revocation, and all other just and proper relief." (R. 42.) Pendleton was therefore on notice that his life insurance license, as well as his auto insurance license, was at stake. Although the Statement of Charges does not contain facts obviously relating to Pendleton's conduct under his life insurance license, Pendleton did not challenge the Charges, and did not raise this issue until after the hearing. By that time, as will be noted below, evidence had been presented from which the ALJ could have reasonably determined that Pendleton had engaged in "dishonest practices" under his life insurance license.

### 4. Proper Evidentiary Standard

Pendleton argues that the ALJ, the Commissioner, and the trial court applied the wrong standard of proof in this case. Neither the ALJ's findings nor the Commissioner's Final Order discuss the standard of proof employed. The trial court assumed that the Commissioner employed the AOPA's general "substantial evidence" test, IND. CODE § 4–21.5–3–27(d), and the court found "substantial evidence" to support the ALJ's findings. Pendleton contends that the more stringent "clear and convincing evidence" standard should have

been used, and argues that the Commissioner exceeded her statutory authority and acted contrary to law by using the lesser standard.

In *Burke v. City of Anderson*, 612 N.E.2d 559 (Ind.Ct.App.1993), this Court considered whether an agency, although one not governed by the AOPA, should employ the "substantial evidence" test or the "clear and convincing" standard in determining whether a police officer had been appropriately terminated from his employment. We noted that the "clear and convincing" evidence standard generally applies where "[i]ndividual interests at stake in a particular state proceeding are both 'particularly important' and 'more substantial than the mere loss of money' or necessary to preserve fundamental fairness in a government-initiated proceeding that threatened an individual with 'a significant deprivation of liberty' or 'stigma.'" *Id.* at 565 (citing *Matter of Moore*, 453 N.E.2d 971, 972 (Ind.1983)). We agreed that the terminated officer had a protected Fourteenth Amendment property interest in his employment, and explained that a level of review higher than the "substantial evidence" test should be used. *Id.* We specifically declined, however, to employ the "clear and convincing standard," explaining in no uncertain terms that "[w]e will not … adopt a clear and convincing standard unless a liberty interest is involved." *Id.* We accordingly explained that, in cases involving the potential deprivation of such protected property interests, the familiar "preponderance of the evidence" standard would be used. *Id.*

■ Pendleton correctly notes that our holding in *Burke* was that the terminated police officer had waived the issue of the proper evidentiary standard by failing to raise it prior to his appeal, and that our discussion regarding the issue was dicta.

*See* 612 N.E.2d at 564. Nevertheless, we find the reasoning of *Burke,* and the cases cited therein, to be persuasive, and we adopt it here. Therefore, contrary to Pendleton's position, the IDOI was not required to establish Pendleton's alleged misconduct with "clear and convincing" evidence, because Pendleton's interest in his insurance licenses was a property interest, and not a liberty interest. Rather, a preponderance of the evidence would have been sufficient, and the reviewing court should have reviewed the evidence under that standard. We will accordingly employ the preponderance standard below in considering the sufficiency of the evidence.

### 5. Proper Procedures

■ Pendleton next takes issue with two *ex parte* communications between the IDOI attorney prosecuting the case and the ALJ, claiming that the communications violated Indiana Code section 4–21.5–3–11, and that the entire proceeding was defective as a result. The statute cited by Pendleton forbids *ex parte* communications "regarding any issue in the proceeding . . . ." IND. CODE § 4–21.5–3–11(a).

Here, the communications involved confirmation of the hearing date, and the location of the case file. These were not communications regarding "issues" in the proceeding. Rather, they were communications regarding purely administrative matters, and were not prohibited by the terms of the statute. Communication regarding such administrative matters is generally not inappropriate, *see* IND. CODE JUDICIAL CONDUCT, canon 3(B)(8) (excepting communications regarding administrative matters from general prohibition against *ex parte* communications under certain circumstances); *Sylvester v. State,* 698 N.E.2d 1126, 1132 (Ind.1998) (*ex parte* communication regarding scheduling "raises no inference of impropriety . . . ."), and

Pendleton does not claim that the communication was prejudicial. We accordingly find no error.

### 6. Sufficiency of the Evidence

■ Finally, Pendleton argues that the evidence presented at the hearing was insufficient to establish that he violated Indiana Code section 27–1–15.5–8(e) in his dealings with Murphy. The ALJ heard evidence that Pendleton introduced Johnson to Murphy as his associate, arranged for Murphy's calls to Johnson to be directed to his office, and covered Johnson's information on Murphy's Gallant insurance policy with stickers displaying his own name and address before delivering the policy to Murphy. Although Pendleton disputed some of this, we must decline Pendleton's invitation to reweigh the evidence. The facts as found by the ALJ were sufficient to establish by a preponderance of the evidence that Pendleton engaged in conduct designed to deceive Murphy about the identity of her insurer, her insurance agent, and Johnson's relationship with State Farm. The ALJ was entitled to conclude that this conduct amounted to prohibited "dishonest practices" under Pendleton's auto insurance license.

This evidence was also sufficient to show that Pendleton's dishonest practices were done under his life insurance license. The ALJ could have inferred that Pendleton's deception was intended to give Murphy the false impression that Johnson was an agent in his State Farm agency so that Murphy would keep all of her insurance business, including her life insurance policy, with Pendleton's State Farm agency, consistent with her stated desire to consolidate all of her insurance matters with one agent. Thus, because the ALJ could conclude that Pendleton's dishonesty was designed in part to ensure that Murphy would maintain her State Farm life policy

in Pendleton's office, the ALJ could have concluded that Pendleton's dishonest practices extended to matters under his life insurance license.

 Pendleton also argues that the ALJ's findings were contrary to law because they fail to refer to evidence in the record. The ALJ's thirty-nine numbered findings of fact exhaustively recite evidence introduced at the hearing, and the significance of Pendleton's argument here is not clear. Pendleton is correct that the ALJ's first finding, that Pendleton held two insurance licenses under numbers C–2104310 and O–2104300, is unsupported in that the actual license numbers were not introduced into evidence. However, as noted above, the IDOI's Statement of Charges advised Pendleton that these very licenses were at issue, and Pendleton has never denied that he did in fact hold the licenses in question. Rather, he testified at the hearing that he sold both the life insurance and auto insurance through State Farm. The inclusion of the license numbers in the ALJ's findings was at worst harmless error.

Affirmed.

BAKER and MATHIAS, JJ., concur.