

**FILED**
Feb 05 2015, 9:56 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Anthony J. Thornton,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

February 5, 2015

Court of Appeals Cause No.
45A03-1405-CR-156

Appeal from the Lake Superior
Court.
The Honorable Salvador Vasquez,
Judge.
Cause No. 45G01-1308-FA-22

**Baker, Judge.**

[1] Anthony Thornton appeals his conviction for class B felony Criminal Confinement[1] as well as the sentence imposed by the trial court for that conviction. Thornton raises a number of arguments, one of which is dispositive. He contends that the trial court erroneously admitted evidence regarding out-of-court statements by an alleged accomplice in violation of his rights under the United States and Indiana Constitutions. We agree, and reverse.

## Facts

[2] In the early morning hours of July 27, 2013, K.W. left her apartment in Illinois to go to a nearby gas station. After completing a purchase inside the gas station, she exited and encountered three men later identified as Thornton, Kevin Dillard, and Denzel Nelson. Dillard asked K.W. if she was alright. K.W. asked Dillard if the men could give her a ride down the street, and they agreed. She entered the vehicle and sat in the back seat; Thornton was driving.

[3] Ignoring K.W.'s requests to take her home, the men instead drove her to an apartment complex in Hammond, Indiana. K.W. followed the men into an apartment and entered the bathroom. Dillard followed her into the bathroom and demanded that she perform oral sex. Feeling outnumbered and threatened, K.W. complied. Nelson then entered the bathroom and attempted to have sex with K.W. The men took turns slapping K.W. and tossed her back and forth by

---

[1] Ind. Code § 35-42-3-3.

her hairpiece. K.W. dropped to the bathroom floor and began to pray out loud. Dillard retrieved a gun and placed it to K.W.'s head and in between her legs. Thornton entered the bathroom and told the other men to let K.W. clean herself up. He told K.W. that he would not let the men kill her but that "You got to do exactly what I tell you to do." Tr. p. 65-66. Thornton then demanded that K.W. perform oral sex on him. Dillard reentered the bathroom and had sex with K.W. After that, Thornton told K.W. to clean herself up.

[4] Thornton and Nelson led K.W. back to the vehicle and drove away. She fled the vehicle at a stoplight and entered a CVS store, where she told the cashier that she had been raped and asked the cashier to contact the police. Later, K.W. retraced the route with a detective and they located the apartment and Thornton's vehicle. K.W. eventually identified Thornton, Dillard, and Nelson from photo arrays.

[5] On July 30, 2013, Thornton gave a voluntary statement to Detective Christopher Matanovich. Thornton told the detective that on the night in question, he, Dillard, Nelson, and Thornton's two children had stopped at a gas station. Dillard and Nelson exited Thornton's vehicle and returned a few minutes later with a woman, who got into the back seat. They drove the female to Thornton's apartment. According to Thornton, they all entered the apartment and Thornton stayed in the main room with his children while the two other men were in the bathroom for an extended period of time with the woman. Thornton reported that it sounded like they were having sex. Thornton reported that "when it was all over with," Thornton and Nelson got

back into the vehicle with the woman to drive her home, but on the way, she got out of the vehicle at a stop light and walked into a CVS. Tr. p. 340-41.

[6] On August 1, 2013, the State charged Thornton with class A felony rape, class A felony criminal deviate conduct, class B felony criminal confinement, and class C felony battery with a deadly weapon. Following a four-day jury trial that began on March 3, 2014, the jury found Thornton guilty of class B felony criminal confinement and was unable to reach a verdict on the remaining counts. On April 11, 2014, the trial court sentenced Thornton to twelve years imprisonment, to be served consecutively to an eighteen-month sentence imposed in a different case. Thornton now appeals.

## Discussion and Decision

[7] Thornton's first argument, which we find dispositive, is that the trial court erroneously permitted certain testimony into evidence. We review a trial court's decision to admit evidence for an abuse of discretion, and will reverse only if the court's decision was clearly against the logic and effect of the facts and circumstances before it. *Lindsey v. State*, 916 N.E.2d 230, 238 (Ind. Ct. App. 2009).

[8] The Confrontation Clause of the Sixth Amendment to the United States Constitution prohibits the admission of an out-of-court statement if it is testimonial, the declarant is unavailable, and the defendant had no prior opportunity to cross-examine the declarant. *King v. State*, 985 N.E.2d 755, 758 (Ind. Ct. App. 2013), *trans. denied*. Similarly, Article 1, Section 13 of the

Indiana Constitution provides that "[i]n all criminal prosecutions, the accused shall have the right to . . . meet the witnesses face to face[.]" To determine whether a statement was testimonial, we look to the primary purpose of the conversation. *King*, 985 N.E.2d at 758. If circumstances indicate that the primary purpose of the conversation was to gather evidence of past events potentially relevant to later prosecution, then the statements are testimonial and protected by the Confrontation Clause. *Id.*

[9] In this case, Detective Matonovich took statements from both Dillard and Thornton during the investigation of the incident. Dillard did not testify at Thornton's trial. At trial, Detective Matonovich testified without objection that he had spoken with Dillard and initially testified that Dillard's version of events was "somewhat" consistent with Thornton's version. Tr. p. 348. Later, the following colloquy took place during direct examination:

> State: Have you spoken with Kevin Dillard since?
>
> Matonovich: Yes.
>
> State: Okay. Without getting into what Mr. Dillard said, because of hearsay rules, did Thornton's version of Thornton's actions match that of Mr. Dillard's version?
>
> Matonovich: No.

Id. at 369. Thornton then objected on the grounds that the testimony violated his Sixth Amendment confrontation rights, and the trial court overruled the objection. Detective Matonovich then again stated, "No, they didn't match

up." *Id.* at 370.  The prosecutor clarified, "As far as Thornton's actions with the victim?"  The detective replied, "Yes."  *Id.*  Detective Matonovich then testified that when he previously stated that Thornton's and Dillard's versions were somewhat consistent, he was referring to a "few similarities" "as far as [K.W.] was involved, she was in the car, she was in his apartment, those few similarities," but "[o]ther than that, there were some major differences in what occurred that night."  *Id.*

[10]  The parties' primary arguments on appeal surround whether this testimony constituted an out-of-court statement that was testimonial in nature.[2]  The State contends that this testimony was not hearsay because it did not assert a fact susceptible of being true or false.  According to the State, because Detective Matonovich did not describe the substance of Dillard's statements, his testimony was not prohibited under the Confrontation Clause.  We cannot agree.

[11]  If anything, the testimony in question here is worse than specific facts.  The testimony was pure innuendo, necessitating that the detective make his *own* determination and interpretation of the content of Dillard's statement as well as Dillard's and Thornton's reliability and credibility.  The purpose of this testimony was to imply to the jury that Thornton was being dishonest, based solely on pure speculation regarding the nature and extent of the alleged

---

[2] The State does not contend that Dillard was available or that Thornton had a prior opportunity for cross-examination.

inconsistencies. Thornton was unable to cross-examine Dillard about his statement, the inconsistencies, or his credibility as a declarant.

[12] We find that this testimony is akin to a witness summarizing the content of an out-of-court statement. Such a summary would constitute hearsay. *See, e.g.*, *Tessely v. State*, 432 N.E.2d 1374, 1375-76 (Ind. 1982) (holding that summaries of an out-of-court conversation constituted "hearsay evidence in its classic form"); *Amoco Oil Co. v. Comm'r of Labor*, 726 N.E.2d 869, 874 (Ind. Ct. App. 2000) (holding that summaries of interviews constituted hearsay); *Cornell v. Rev. Bd.*, 179 Ind. App. 17, 21, 383 N.E.2d 1102, 1105 (Ind. Ct. App. 1979) (holding that summary of a student's attendance record constituted hearsay). While Detective Matonovich's testimony is a very general summary, it is still a summary of Dillard's statements that allegedly conflicted with Thornton's. We agree with Thornton that to permit the State to hint at the substance of a conversation so long as specific details are not mentioned would violate both the United States and Indiana Constitutions, inasmuch as it would permit the State to bootstrap in evidence that is otherwise inadmissible and permit a witness to make his own determination of a declarant's reliability.

[13] Furthermore, there can be no real dispute that the nature of Dillard's statement to Detective Matonovich was testimonial in nature. The primary purpose of the conversation between Dillard and the detective was clearly to prove past events potentially relevant to later criminal prosecution.

The State argues that this issue has been waived because Thornton failed to object when Detective Matonovich originally testified that Dillard's statement was "somewhat" consistent with Thornton's, did not object until after the detective said "no" to the prosecutor's question regarding whether Dillard's statement was consistent with Thornton's, and did not object to the continuing colloquy after the trial court had overruled his objection. First of all, we do not find that the detective's testimony that Dillard's statement was inconsistent is cumulative of his earlier testimony that it was somewhat consistent. To the contrary, these two statements are contradictory rather than cumulative. Furthermore, we are not persuaded that Thornton's failure to object before the detective said "no" or to continue to object after the trial court overruled him serves to waive this argument. Thornton objected on the basis of hearsay and his rights under the Confrontation Clause. The trial court overruled the objection. We find that this was sufficient to preserve the issue for appeal.

Finally, the State directs our attention to authority holding that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Koenig v. State*, 933 N.E.2d 1271, 1273 (Ind. 2010). We cannot conclude that this error was harmless beyond a reasonable doubt. Initially, we note that the jury was unable to reach a verdict on all but one of the charges against Thornton, so it cannot be said that the evidence of his guilt was without doubt. Furthermore, Detective Matanovich's testimony was pure innuendo that left the jury free to speculate regarding Thornton's honesty as

well as the nature, extent, and even existence of possible inconsistencies between Thornton's version and Dillard's. Thornton was unable to cross-examine Dillard about any of these subjects. We simply cannot conclude beyond a reasonable doubt that this testimony was harmless. Consequently, we reverse Thornton's conviction and remand for further proceedings.

[16] Although we need not address the remaining issues, we choose to address Thornton's arguments regarding prosecutorial misconduct as these issues may arise again should the State choose to retry Thornton. In reviewing a claim of prosecutorial misconduct, we determine first, whether misconduct occurred, and second, whether the misconduct placed the defendant in a position of grave peril to which he would not have been otherwise subjected. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014). When the allegations of misconduct arise from a prosecutor's argument, it has been established that "[w]hether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006).

[17] Both of Thornton's claims of misconduct stem from closing argument. During defense counsel's closing argument, counsel pointed out that while K.W. testified that she had been bleeding profusely after being struck in the apartment, the samples taken from the apartment that were tested were

inconclusive for a match with K.W.'s blood. In response, the prosecutor argued as follows:

> They want you to believe that this DNA—hit on that it's not inconclusive. She told you it was presumptive blood. They don't have the equipment to finish out the confirmatory or the DNA analysis. *They had a minimal amount of time because of the speedy trial request in which to get all this testing done.* Did as much testing as we could.

Tr. p. 492 (emphasis added). The right to a speedy trial is guaranteed by both the Sixth Amendment to the United States Constitution and Article 1, Section 12 of the Indiana Constitution. This right is "fundamental to our system of justice[.]" *Crawford v. State*, 669 N.E.2d 141, 145 (Ind. 1996).

[18] To blame a shortcoming in the State's evidence on a defendant's invocation of a fundamental constitutional right surely constitutes prosecutorial misconduct, and likely also constitutes fundamental error. *See Whitlock v. State*, 576 N.E.2d 640, 641 (Ind. Ct. App. 1991) (holding, in the context of the Fifth Amendment right to refrain from testifying, that "[a]ny [prosecutorial] comment which directly or even indirectly may be interpreted by the jury as comment on the accused's exercise of his rights is reversible error" even in the absence of a contemporaneous objection). We caution the prosecutor to avoid making a similar comment in the future should the State choose to retry Thornton.

[19] Thornton's second claim of prosecutorial misconduct also arises from closing argument. The prosecutor made the following comments:

> [K.W.] was brave enough to follow through. Most women don't. Why? Because they're made to feel like they're on trial. We treat them like they're criminals, when they have the courage to say no way. I can't let this go on. She followed through every step of the way and came here to you guys this week to face everybody in here and told you her story.

Tr. p. 476. Then, on rebuttal, the prosecutor stated that "[s]omething I want you to consider is that we re-victimize these people who come forward with rape." *Id.* at 498.

[20] A prosecutor may not request that a jury convict a defendant for any reason other than his guilt. *Cooper*, 854 N.E.2d at 837-38. It is improper for a prosecutor to invoke sympathy for a victim as a basis for a conviction. *Woolston v. State*, 453 N.E.2d 965, 970 (Ind. 1983). Similarly, a prosecutor may not urge a jury to convict a defendant to encourage other victims to come forward. *Hand v. State*, 863 N.E.2d 386, 396 (Ind. Ct. App. 2007). In this case, the prosecutor's statements made during closing argument and rebuttal fell into all three of these prohibited categories of argument. Should the State decide to retry Thornton, we admonish the prosecutor to avoid making similar comments the next time around.

[21] The judgment of the trial court is reversed and remanded.

Vaidik, C.J., and Riley, J., concur.