ATTORNEYS FOR APPELLANT
Steve Carter
Attorney General of Indiana

David L. Steiner
Frances H. Barrow
Timothy J. Junk
Deputy Attorney Generals
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
George M. Plews
Brett E. Nelson
Indianapolis, Indiana



In the

## Indiana Supreme Court

FILED
Dec 09 2008, 10:00 am

CLERK
of the supreme court,
court of appeals and
tax court

No. 49S02-0804-CV-183

THE INDIANA DEPARTMENT OF
ENVIRONMENTAL MANAGEMENT,

*Appellant (Defendant below),*

v.

RAYBESTOS PRODUCTS COMPANY,

*Appellee (Plaintiff below).*

Appeal from the Marion Superior Court, No. 49D12-0209-PL-1553
The Honorable Robyn Moberly, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-0609-CV-782

**December 9, 2008**

**Boehm, Justice.**

We hold that an agreed order for environmental cleanup with the Indiana Department of Environmental Management ("IDEM") is an agency action governed by the Indiana Administrative Orders and Procedures Act, not a contract that will support a claim for damages from IDEM. We also hold that IDEM has authority to approve risk-based cleanups, and IDEM's communica-

tions with the federal Environmental Protection Agency did not violate its Agreed Order with Raybestos.

**Facts and Procedural History**

Raybestos Products Company manufactures brakes and clutches in its Crawfordsville, Indiana plant. This plant is adjacent to Shelly Ditch, a 5000-foot open earthen drain surrounded by homes, a school, fairgrounds, and a community swimming pool. In 1995, IDEM identified polychlorinated biphenyls ("PCBs") in Shelly Ditch and notified Raybestos of its findings. Raybestos investigated internally and learned that in the late 1960s its corporate predecessor had used hydraulic oil containing PCBs. Some of this oil spilled and was pumped to a culvert which discharged into Shelly Ditch.

In 1996, IDEM sent Raybestos a "Special Notice of Potential Liability" for cleanup of Shelly Ditch, and began negotiating a cleanup plan with Raybestos. IDEM also notified the federal Environmental Protection Agency ("EPA") of its findings. IDEM recommended that Shelly Ditch receive a high priority in the Superfund Hazard Ranking System, but because of IDEM's ongoing negotiations, EPA initially assigned the site a low priority.

A December 1996 Statement of Work outlined a plan to "address human health and environmental concerns and bring the site to closure such that no future actions are required." The Statement of Work called for Raybestos to prepare a Risk Assessment for IDEM's approval. In February 1997, IDEM and Raybestos entered an Agreed Order approved by IDEM's Commissioner incorporating the Statement of Work and requiring Raybestos to remove and dispose of PCBs in Shelly Ditch. Raybestos submitted a Risk Assessment which concluded that the PCB levels in Shelly Ditch posed no human health risks. After review by IDEM staff and an outside risk assessment contractor, IDEM approved the Risk Assessment in March 1998. Neither the Agreed Order nor the Risk Assessment contained a numerical cleanup level.

In May 1998, based on the approved Risk Assessment, Raybestos submitted a Technical Memorandum proposing no removal of PCBs from Shelly Ditch. Two months later, IDEM commented on the proposal and suggested that Raybestos consider a "hot spot" removal, in

2

which high-level areas are cleaned to a specified level but the site is not cleaned to a uniform level.

In late August 1998, IDEM's Commissioner, a successor to the Commissioner who signed the Agreed Order, visited Crawfordsville and publicly promised residents that Shelly Ditch would be cleaned up promptly. On August 25, 1998, the U.S. Fish and Wildlife Service identified Shelly Ditch as within the range of the Indiana bat and the bald eagle, at the time respectively endangered and threatened species.

At some point, IDEM determined that the Risk Assessment had been approved in error, and an internal memorandum in September 1998 explored possible ways to require a more stringent cleanup level, including involving EPA. At about the same time, Raybestos proposed a cleanup that would allow hot spots to contain PCB concentrations up to 238 parts per million ("ppm"). IDEM responded that this proposal was unacceptable, and in November 1998, IDEM withdrew its approval of the Risk Assessment and disapproved the Technical Memorandum.

Raybestos filed a Petition for Administrative Review in the Office of Environmental Adjudication. IDEM and Raybestos stipulated that the Agreed Order provision in which Raybestos agreed to "waive its right to administrative review of this Order" had "no effect on the proceedings." Despite the parties' stipulation, the Administrative Law Judge dismissed Raybestos's petition for review, finding as a matter of law that Raybestos had waived its right to review of IDEM's actions.

Raybestos then sought judicial review of IDEM's actions in the Marion Superior Court frequently referred to as the "Environmental Court." The Environmental Court first concluded that the parties' stipulation bound the Administrative Law Judge to permit review. The Environmental Court then determined that IDEM lacked authority under the Agreed Order to withdraw approval of the Risk Assessment and that IDEM's decision to withdraw approval was "arbitrary and capricious" and "not supported by any substantial evidence." The Environmental Court found that IDEM's only reason for withdrawing approval was to avoid setting a precedent for the cleanup level proposed by Raybestos, and ordered IDEM to reinstate its approval of the Risk Assessment and to approve the Technical Memorandum. IDEM did not appeal that judgment, and reinstated the Risk Assessment and approved the Technical Memorandum.

Meanwhile, beginning in October 1998, IDEM urged EPA to require a more complete cleanup, and in December 2000, EPA issued a Unilateral Agreed Order ("UAO") requiring Raybestos to clean up Shelly Ditch to a level of no greater than 10 ppm PCBs. This cleanup was substantially more expensive than a 238 ppm hot spot cleanup.

In July 2002, Raybestos filed the complaint initiating this lawsuit in Marion Superior Civil Division, claiming breach of contract by IDEM. Raybestos alleged that the Agreed Order constituted a contract that IDEM breached by withdrawing approval of the Risk Assessment, disapproving the Technical Memorandum, and requesting EPA involvement in ordering a more stringent cleanup. Raybestos sought damages and a declaratory judgment that IDEM is liable for any future expenses incurred in remediating Shelly Ditch beyond what was required by the 1997 Agreed Order.

IDEM moved to dismiss under Trial Rules 12(B)(1) and 12(B)(6), asserting that (1) the trial court lacked subject matter jurisdiction, (2) any damages were caused by EPA, (3) IDEM did not breach the Agreed Order, and (4) the Agreed Order is not a contract enforceable by a claim for damages. Raybestos moved for summary judgment, contending that the Environmental Court's order established IDEM's breach and that IDEM had admitted the breach. The trial court granted partial summary judgment for Raybestos, concluding that as a matter of law, IDEM's communications with EPA breached the Agreed Order and IDEM's right or obligation to seek EPA enforcement under some circumstances did not justify the breach. The trial court certified its partial summary judgment order for interlocutory appeal, but the Court of Appeals denied IDEM's request to accept an interlocutory appeal.

Damages from the alleged breach then proceeded to a bench trial. On June 12, 2006, the trial court entered its findings of fact, conclusions of law, and partial judgment. The trial court found that EPA's enforcement action was due solely to "IDEM's persistent and repeated requests" that EPA address Shelly Ditch, and entered a partial judgment for $11,645,321.58—the difference between the cost of the EPA-required cleanup and the projected costs of a cleanup to 238 ppm—plus post-judgment interest at the statutory rate. IDEM appealed this order and the trial court's previous partial grant of summary judgment. On October 30, 2006, after hearing additional evidence, the trial court entered an additional award of $4,716,691.33 representing

future cleanup costs and attorney fees. IDEM also appealed this order, and the Court of Appeals consolidated the two appeals.

The Court of Appeals reversed, holding that even if the Agreed Order were a contract, it would be unenforceable as "contrary to public policy" because a cleanup level of 238 ppm is twenty times the level allowed by federal regulations. Ind. Dep't of Envtl. Mgmt. v. Raybestos Prods. Co., 876 N.E.2d 759, 763 (Ind. Ct. App. 2007). We granted transfer.

We hold that the Agreed Order is not a contract that will support a claim for damages. For the reasons explained below, we do not agree that IDEM violated the order by communicating with EPA, or that IDEM's original agreement to a less stringent cleanup than EPA regulations prescribe would necessarily contravene public policy.

**Standards of Review**

IDEM appeals the trial court's denial of the motion to dismiss, partial grant and partial denial of summary judgment, and judgment entries dated June 12, 2006 and October 30, 2006 containing findings of fact and conclusions of law. To the extent they involve only legal issues, we review the trial court's orders de novo. Charter One Mortgage Corp. v. Condra, 865 N.E.2d 602, 604 (Ind. 2007); Univ. of S. Ind. Found. v. Baker, 843 N.E.2d 528, 531 (Ind. 2006). We uphold the trial court's findings of fact unless they are clearly erroneous. Ind. Trial Rule 52(A).

**I. Damages for Breach of the Agreed Order**

Raybestos seeks damages under Indiana Code section 34-13-1-1 (2004), which permits claims against the state arising out of express or implied contracts. IDEM responds that Raybestos may not bring a contract action for two reasons: (1) the Agreed Order is an agency action that is subject to challenge only under the Indiana Administrative Orders and Procedures Act ("AOPA"), I.C. §§ 4-21.5-1-1 to -7-9 (2004), and (2) the Agreed Order fails to meet the statutory requirements for a state agency contract. For the reasons explained below, we agree with IDEM

5

and hold that the Agreed Order is not a contract that will support a claim for damages against the State.[1]

A. *Indiana Administrative Orders and Procedures Act*

AOPA "establishes the exclusive means for judicial review of an agency action." Id. § 4-21.5-5-1. AOPA exempts several agencies and agency actions from this provision, but neither IDEM nor the Agreed Order is among them. Ind. Code Ann. §§ 4-21.5-2-4, -5 (West Supp. 2008). Accordingly, if IDEM is an agency and the Agreed Order is an agency action, AOPA is the exclusive means to review the order.

As a preliminary matter, we address whether IDEM has preserved its claim that AOPA limits the remedies available to Raybestos. IDEM argued before the trial court that the Agreed Order is not enforceable by a claim for damages, but IDEM appears to have framed this argument specifically in terms of AOPA for the first time in its brief to the Court of Appeals. Generally, an appellate court will not review an issue that was not presented to the trial court. Cavens v. Zaberdac, 849 N.E.2d 526, 533 (Ind. 2006). Raybestos briefed the issue and does not contend that IDEM waived the issue of whether AOPA precludes a claim for breach of contract. In any event, the issue challenges the jurisdiction of the trial court, and for this reason we address it. See State Bd. of Tax Comm'rs v. Ispat Island, Inc., 784 N.E.2d 477, 482 (Ind. 2003) ("Under Indiana law, if a party is required by the Administrative Orders and Procedures Act to exhaust its administrative remedies before an agency prior to obtaining judicial review of the agency decision, courts are completely ousted of subject matter jurisdiction to hear the case at all."); Town Council of New Harmony v. Parker, 726 N.E.2d 1217, 1223 n.8 (Ind. 2000) (lack of subject matter jurisdiction cannot be waived).

IDEM is plainly an "agency" as defined by Indiana Code section 4-21.5-1-3, and the Agreed Order was an action by its Commissioner. AOPA defines "agency action" as "the whole or part of an order," "the failure to issue an order," or "[a]n agency's performance of, or failure

---

[1] Because we hold that the Agreed Order is not a contract, we do not address Raybestos's arguments that rely on application or extension of private contract doctrine: that IDEM breached a contract by preventing Raybestos's performance, and that for at least government contracts, we should impose a general duty of good faith and fair dealing.

to perform, any other duty, function, or activity under this article." I.C. § 4-21.5-1-4. Both the Agreed Order—an administrative order entered pursuant to section 13-25-4-23—and IDEM's communications with EPA are agency actions. If we view this claim as one for failure to comply with an implied provision of the Order, it seeks relief from an agency action because the order itself is by definition an "agency action." If on the other hand the claim is for failure to carry out an obligation under the Order not to communicate with EPA, it is for "failure to perform" a "duty, function, or activity under this article." Indeed, communication with EPA on enforcement matters and appropriate remedies is a duty or function mandated by federal law. E.g., 40 C.F.R. §§ 300.505 (2008) (requiring detailed annual consultation about activities), 300.515 (requiring communication about remedy selection); see also Superfund Memorandum of Agreement Between the State of Indiana and the United States Environmental Protection Agency Region V (1992) (outlining agencies' agreement to communicate regularly, include each other in settlement agreements, and permit changes in lead agency status).

Pursuant to a statute specifically addressing review of IDEM's actions, the exclusive means for review of an agency action of the IDEM Commissioner is by petition to the Office of Environmental Adjudication. I.C. § 4-21.5-7-3. That administrative body must grant relief to a party who has been prejudiced by agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." Id. § 4-21.5-5-14. The forms of relief available are to "set aside an agency action and: (1) remand the case to the agency for further proceedings; or (2) compel agency action that has been unreasonably delayed or unlawfully withheld." Id. § 4-21.5-5-15. Money damages are not authorized, presumably reflecting the General Assembly's policy judgment that specific performance is a more appropriate remedy for agency error than a damages award ultimately borne by the taxpayers.

In sum, pursuant to AOPA, exclusive jurisdiction to review the Agreed Order and IDEM's obligations and functions under the order lies in the administrative procedure provided by these statutes, and a claim against the State or its agency for damages is not among the available remedies.

B. *Contract Claims Against State Agencies*

7

Raybestos contends that statutory provisions other than AOPA authorize its claim. Specifically, Raybestos points to Indiana Code section 34-13-1-1(a), which allows claims against the State for breaches of both express and implied contracts. Raybestos essentially contends that this provision overrides the exclusive jurisdiction provision of AOPA. We think these statutory provisions are not inconsistent and collectively demonstrate that Raybestos's claim is not well founded. Rather than apparently inconsistent provisions, AOPA and the statutes governing state contracts fit nicely together.

AOPA does not completely foreclose contract claims against state agencies. For example, exempted from AOPA's coverage are agency contracts for the acquisition, leasing, or disposition of property, or the procurement of goods or services. Ind. Code Ann. § 4-21.5-2-5(11) (West Supp. 2008). This exemption mirrors the provisions found in Indiana Code sections 4-13-2-14.1 and 4-13-2-14.2, which require contracts with state agencies to be in writing and approved by the Commissioner of the Indiana Department of Administration, the Director of the Indiana State Budget Agency, and the Attorney General. IDEM asserts that the Agreed Order does not meet these requirements, and Raybestos concedes this point but responds that the requirements do not apply to its claim because these formalities apply only to contracts for purchases of goods or services. Raybestos argues that the limited application of these requirements to contracts for goods or services is shown by their placement in a chapter labeled "Administrative Management of State Services, Employees, Purchases, and Property." To the extent Raybestos argues that the chapter name requires a particular interpretation, the General Assembly has instructed that the descriptive headings of titles, articles, and chapters "are intended for organizational purposes only and are not intended to affect the meaning, application or construction of the statute they precede." I.C. § 1-1-1-5(f). But assuming these requirements apply only to contracts for goods or services, this merely reflects the point that the very same contracts are exempted from the exclusive judicial review provisions. In other words, presumably because a contract for the purchase of goods or services will support a claim for damages, it is exempted from the exclusive jurisdiction provision of AOPA. Raybestos concedes the Agreed Order is not such a contract. It therefore is not exempted from AOPA.

## II. IDEM's Authority to Approve Risk-Based Cleanups

8

Because we hold that under AOPA the Agreed Order does not support a claim for damages, we need not decide whether public policy precludes the construction of the Agreed Order urged by Raybestos. However, because the Court of Appeals reversed the trial court's judgment on this issue, we briefly turn to IDEM's authority to order risk-based cleanups, cleanups above or below the numerical level set by regulation.[2] The Court of Appeals concluded that IDEM lacked authority to approve a cleanup level that did not meet the applicable federal standard of 10 ppm. For this conclusion, the Court of Appeals relied on the federal PCB Spill Cleanup Policy, 40 C.F.R. §§ 761.120–761.135 (2008), which provides that "[s]oil contaminated by the spill will be decontaminated to 10 ppm." Id. § 761.125(c)(4)(v). Even if applicable to this cleanup,[3] that policy also gives EPA "flexibility to allow less stringent or alternative decontamination measures based upon site-specific considerations."[4] Id. § 761.120(c). We agree with Raybestos that the policy therefore does not constrain IDEM from agreeing to less stringent measures.

### III. IDEM's Actions Did Not Violate the Agreed Order

We respectfully disagree with the trial court's conclusion that money damages are necessary to further the "interest in the government abiding by its promises" which facilitates cleanup

---

[2] Raybestos argues that the Environmental Court order precludes IDEM from claiming that it lacked authority to approve a cleanup that did not reduce PCBs to 10 ppm. The order concluded that IDEM lacked authority to withdraw the Risk Assessment. It did not specifically address whether IDEM had authority to approve a cleanup above 10 ppm.

In any event, claim preclusion applies only when the party against which it will be applied had a full and fair opportunity to litigate the issues or when application would be unfair given the circumstances. Tofany v. NBS Imaging Sys., Inc., 616 N.E.2d 1034, 1038 (Ind. 1993) (citing Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979)). It would be unfair to preclude IDEM from arguing its authority because the previous action was for administrative relief, not money damages, and by that time EPA had already ordered a more stringent cleanup. Id. ("[U]nfairness to the defendant against whom an estoppel is asserted may result . . . where the defendant had little incentive to vigorously litigate the first action either because the damages were small or nominal, or because future suits were not foreseeable." (quoting Parklane Hosiery, 439 U.S. at 330–31)).

[3] The parties dispute whether the 10 ppm standard applies to Shelly Ditch. That standard does not apply to pre-1987 spills, 40 C.F.R. § 761.120(a)(1), and the parties dispute whether the spill occurred in the late 1960s or continuously through 1996.

[4] This federal PCB Spill Cleanup Policy has been incorporated by reference in the Indiana Administrative Code, 329 I.A.C. 4.1-5-1 (2000), and provides IDEM the same flexibility afforded to EPA by federal regulation. This policy was promulgated as part of the solid waste management regulations, which the IDEM Commissioner can enforce by lawsuit or agreed order. I.C. §§ 13-14-2-6, -20-15-7, -30-3-3. We do not address whether it applies to this action instituted under the Hazardous Substances Response Trust Fund provisions, id. §§ 13-25-4-1 to -28.

9

agreements.  Our holding today does not remove the incentive to enter into voluntary cleanup agreements with IDEM.  If IDEM unjustifiably violates an agreement or acts arbitrarily, its performance can be compelled—as Raybestos demonstrated by seeking judicial review of IDEM's withdrawal of approval of the Risk Assessment.

On the other hand, the public interest is not served by enforcing promises that were never made.  We accept the trial court's finding that EPA would not have acted absent IDEM's prodding, and we recognize the practical difficulties EPA's intervention caused Raybestos.  For better or worse, federal "overfiling"—EPA's initiation of a cleanup after a state has brought an enforcement action—is a risk known to parties negotiating a cleanup with a state agency.[5]  If Raybestos wished to foreclose EPA action, it needed to deal with EPA.  At no time did IDEM promise not to involve EPA.  The Agreed Order does not purport to forbid IDEM's communication with EPA, and IDEM could not bind itself to fail to carry out its statutory obligations, including compliance with the federal regulations requiring communication between the agencies.  E.g., 40 C.F.R. §§ 300.505 (2008) (requiring detailed annual consultation about activities), 300.515 (requiring communication about remedy selection).  Moreover, the Agreed Order itself acknowledged the potential applicability of federal authority and directs compliance with the most stringent cleanup requirements:  "In the event of a conflict in the application of Federal, state, or local laws, ordinances and regulations, [Raybestos] shall comply with the most stringent of said laws, ordinances, or regulations, unless provided otherwise in writing by IDEM."  Finally, the Agreed Order provides that "IDEM and [Raybestos] reserve all rights and defenses they may have pursuant to any available legal authority unless expressly waived herein."  In short, IDEM did not and could not waive its authority to communicate with EPA, and did not commit to do more than suspend its own enforcement efforts.

---

[5] See Clifford Rechtschaffen & David L. Markell, Reinventing Environmental Enforcement and the State/Federal Relationship 109–11 (2003) (describing a judicial split on the issue of whether EPA has authority to overfile, with most courts holding that overfiling is appropriate); Hubert H. Humphrey III & LeRoy C. Paddock, The Federal and State Roles in Environmental Enforcement:  A Proposal for a More Effective and More Efficient Relationship, 14 Harv. Envtl. L. Rev. 7, 14 (1990) ("After an overfiling, the regulated entities quite understandably become concerned that, without involving EPA, they cannot be sure a compliance schedule or a penalty amount agreed to by a state is final."); Christopher J. Redd, Comment, The Adversarial Relationship Between the States and EPA:  Conflict Over State Authority Under CERCLA, 3 Dick. J. Envtl. L. & Pol'y 101, 105 (1993) ("From the perspective of a responsible party, settlement with state officials does not necessarily represent the end of the matter, or the limit of their liability.").

## Conclusion

Because the Agreed Order does not support a claim for damages and was not violated by IDEM's actions, the trial court's orders denying IDEM's motions to dismiss and for summary judgment are reversed. This case is remanded with instructions to vacate the judgments in favor of Raybestos and dismiss the complaint for lack of subject matter jurisdiction.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.