# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 04 2020, 5:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Carrie G. Doehrmann
Alexander P. Will
Maggie L. Smith
Indianapolis, Indiana

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Donn H. Wray
Glenn D. Bowman
Marc A. Menkveld
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

The City of Indianapolis, and Indiana Department of Environmental Management,

*Appellants-Respondents,*

v.

Moran Electric Service, Inc.,

March 4, 2020

Court of Appeals Case No. 18A-PL-3055

Appeal from the Marion Superior Court

The Honorable Patrick J. Dietrick, Judge

Trial Court Cause No. 49D12-1705-PL-17993



*Appellee-Petitioner*

**Altice, Judge.**

# Case Summary

The City of Indianapolis (the City) took possession of a certain contaminated property and engaged in significant remediation and monitoring activities. Believing that the contaminated site had been sufficiently remediated, the City petitioned the Indiana Department of Environmental Management (IDEM) for issuance of a No Further Action letter (NFA Letter). After assessing the site, IDEM concluded that no further remediation was necessary and therefore issued an NFA Letter to the City.

Moran Electric Service, Inc. (Moran), once an owner of property adjacent to the contaminated site, challenged IDEM's issuance of the NFA Letter by filing objections with and seeking administrative review by the Office of Environmental Adjudication (OEA). Moran argued that IDEM improperly issued the NFA Letter because the remedial goals established for the site had not been met. The OEA disagreed, finding that IDEM's issuance of the NFA Letter was proper. Moran timely sought judicial review of the OEA's

decisions. The trial court reversed, finding that IDEM's issuance of the NFA Letter, and the OEA's review thereof, was not based on proper remediation standards. The City and IDEM now appeal, presenting several issues for our review, which we consolidate and restate as: Did the trial court err in finding that IDEM and the OEA used incorrect remediation standards in determining that the contaminated site had been sufficiently remediated?

We reverse.

## Facts & Procedural History

### *Background*

Ertel Manufacturing Corporation (Ertel) operated a 250,000 square foot manufacturing facility on three parcels of land with frontage along what is now Andrew J. Brown Drive in Indianapolis (the Ertel Site).[1] Ertel's manufacturing process led to the release of hazardous substances, including petroleum and chlorinated solvents such as trichloroethylene (TCE) and tetrachloroethylene (PCE), into the soil and groundwater at the Ertel Site. Around 2001, operations at the facility ceased, and the Ertel Site was abandoned.

Moran once operated on a site located directly south of the Ertel Site (the Moran Site). Moran purchased, stored, used, and disposed of chlorinated

---

[1] The three parcels of land comprising the Ertel Site form a "P-shape." Directly contiguous to the south and east of the Ertel Site (i.e., sitting inside the "crook" of the P-shaped parcels) is a parcel of land formerly owned by Zimmer Paper Products, Inc. (the Zimmer Parcel).

solvents—i.e., TCE and PCE—in its operations until its plant closure sometime in 1995 or 1996. IDEM believed that contamination at the Moran Site resulted "predominantly from the sources at the Moran [S]ite itself", but given the groundwater flow direction, the Moran Site was also "impacted by contamination emanating from the [Ertel] Site." *Joint Appendix of Appellants Vol. VIII* at 57; *Joint Appendix of Appellants Vol. XII* at 3. On October 4, 2005, Major Tool and Machine, Inc. (Major Tool) purchased the Moran Site at a tax sale for the expansion of its operations.

[6] Around 2005, IDEM and the Environmental Protection Agency (EPA) started an investigation into contamination at the Ertel Site. The EPA funded the initial removal of several potential sources of hazardous substances as well as the initial investigation into the subsurface contamination. The City ultimately acquired the Ertel Site in 2007 at a tax sale.[2] Over the course of the next several years, the City performed extensive environmental assessments and remediation activities at the Ertel Site, including the removal and excavation of 37,000 tons of contaminated soil, demolition of certain structures, and groundwater and vapor intrusion monitoring.

[7] In September 2007, the City and Major Tool entered into an agreement with respect to the Ertel Site. Major Tool leased the Ertel Site for a period of five

---

[2] The City's "most immediate motivation" in procuring the Ertel Site was to address the environmental issues. *Joint Appendix of Appellants Vol. IX* at 549. The City was also aware that Major Tool had interest in the Ertel Site for a proposed expansion of its facility "if the environmental issues could be dealt with." *Id.*

years and constructed a manufacturing facility on the footprint of the former Ertel facility. By the end of the lease term, the City was obligated to secure an NFA Letter for the Ertel Site in order to trigger Major Tool's obligation to purchase the Ertel Site from the City.

### The Agreed Order

[8] In 2008 and 2010, the City and IDEM, respectively, filed separate lawsuits against Ertel asserting claims under Ind. Code § 13-25-4-10[3] and seeking a declaratory judgment that Ertel was responsible for past and future costs associated with the cleanup of the hazardous substances at or flowing from the Ertel Site. In July 2011, IDEM, the City, Ertel, and Ertel's insurance companies entered into a single Settlement Agreement and Agreed Order (the Agreed Order) for both actions and submitted such to the trial court. In October 2011, the trial court approved the Agreed Order.

[9] The Agreed Order provided that the mutual objectives of the parties were:

> (a) to protect public health and welfare and the environment at and around the [Ertel] Site; (b) for Ertel and [the insurance companies] on Ertel's behalf to make a cash payment to resolve all past, present or future Claims or liabilities of any kind related to the [Ertel] Site regarding releases of Contamination, whether known or unknown, alleged to have occurred at or emanate from the [Ertel] Site; (c) to provide a complete release, covenant not to

---

[3] I.C. § 13-25-4-10(a) states that the commissioner "may proceed in the appropriate court to recover costs and damages [related to the release or threatened release of hazardous substances] for which a responsible person is liable to the state."

sue, contribution protection[4] and finality to Respondents and [the insurance companies] for all past, current and future remedial or removal actions at or in connection with the [Ertel] Site regarding Contamination, whether known or unknown, alleged to have occurred at or emanate from the [Ertel] Site; and (d) to provide funds to allow IDEM and the City to recover a portion of past costs in connection with remedial activities at the [Ertel] Site, and for IDEM to conduct and complete future Response Actions at or in connection with the [Ertel] Site and close the [Ertel] Site, including any off-Site areas of Contamination, as set forth herein.

*Joint Appendix of Appellants Vol. II* at 94. As to reimbursement for costs incurred, the Agreed Order provided that Ertel's insurance companies would pay $4,000,000 to the City and an additional $1,000,000 to an IDEM escrow account, with $140,000 of this amount allocated for past costs incurred by IDEM and $860,000 allocated for any future remediation costs incurred by IDEM to obtain "No Further Action status" for the Ertel Site. *Id.* at 95. Any funds remaining in the IDEM escrow account after IDEM issued an NFA Letter were to be turned over to the City.

[10] The Agreed Order set out the remedial goals for the Ertel Site as:

(1) reducing the on-site Contaminants of concern to industrial default RISC[5] cleanup levels; and (2) reducing Contaminants of concern flowing off-site in the groundwater to at or below

---

[4] *See* I.C. § 13-25-4-27(b) and CERCLA § 113(f)(2), 42 U.S.C. § 9613(f)(2).

[5] RISC is an acronym "Risk Integrated System of Closure." *Joint Appendix of Appellants Vol. XXVII* at 12.

MCLs[6] or to a site specific risk level, as defined by IDEM RISC guidance, to be protective of human health and the environment and of the City's water supply;

\* \* \*

d. When the remedial goals have been met, IDEM will issue a[n NFA] Letter to [the City and Ertel].

*Id*. at 97-98. The ultimate goal was to obtain a notice of closure from IDEM, which refers to the end result of remediation where IDEM issues written recognition—typically through an NFA Letter—stating that a party has demonstrated attainment of specific remedial or screening objectives for contamination on a property such that it no longer poses a risk to human health or the environment.

### *RISC*

RISC was a non-rule policy document authorized by Ind. Code § 13-14-1-11.5 that "provide[d] a systematic approach for consistently and rationally implementing the laws and rules that govern site investigation and closure." *Joint Appendix of Appellants Vol. XXVII* at 12. "The primary goal of RISC [wa]s to ensure that risks to human health and the environment [we]re reduced to a negligible level." *Id*. RISC was adopted by IDEM in 1996 and amended in 1999 and again in 2001. Under RISC, there were two methods employed to

---

[6] MCLs means "maximum contaminant levels" set by the Safe Drinking Water Act, 40 CFR 141.2.

obtain closure of a contaminated site: default closure and nondefault closure. The default method was basically a "one size fits all" approach where closure occurred automatically when the level of contaminants present in soil and groundwater were reduced below standardized industry default closure levels (IDCLs).[7] *Joint Appendix of Appellants Vol. XIII* at 131.

[12] Although RISC focused primarily on the default closure process, IDEM recognized that such approach did not fit all situations. In such cases, parties could follow the nondefault closure process under RISC, which "include[d] any pertinent procedure with a valid technical or policy basis . . . not listed as a default IDEM preference." *Id.* The nondefault closure method was considered "neither superior nor inferior to the default approach;" it simply provided a greater degree of flexibility than the default closure method because closure details could be site-specific. *Id.* One such nondefault method provided for the use of a potential exposure concentration (PEC)[8] calculation for comparing sample data with IDCLs. Site closure could be obtained if it could be shown that PECs for a contaminated site were less than IDCLs.

---

[7] IDCLs are specific numeric levels of contaminants in soil and groundwater at industrial sites that are used to determine when an environmental cleanup has achieved a level of adequately protecting human health and the environment.

[8] A PEC is the "constituent concentration in surface and subsurface soil that is representative of the site mean (based on random sampling), or the highest concentrations at the sample locations (based on judgmental sampling)." *Addendum* at 7.

## *Change in the Law*

During the 2009 legislative session, House Enrolled Act 1162 (HEA 1162) amended several statutes regulating environmental remediation projects in Indiana to change the remediation objectives that IDEM must consider. The purpose of the amendments was to shift the focus for closure to risk-based objectives. The changes went into effect on July 1, 2009. I.C. § 13-25-5-8.5 now provides:

> (a) A voluntary remediation work plan must specify the remediation objectives for the site. Subsections (b) through (e) apply to a site regardless of whether the site was entered into the voluntary remediation program before July 1, 2009, or after June 30, 2009.
>
> (b) The remediation objectives for each hazardous substance and any petroleum on the site shall be based on:
>
>> (1) background levels of hazardous substances and petroleum that occur naturally on the site; or
>>
>> (2) an assessment of the risks pursuant to subsection (d) posed by the hazardous substance or petroleum presently found on the site taking into consideration the following:
>>
>>> (A) Expected future use of the site.
>>>
>>> (B) Measurable risks to human health, natural resources, or the environment based on the:
>>>
>>>> (i) activities that take place; and
>>>>
>>>> (ii) environmental impact;
>>>
>>> on the site.
>
> (c) If the:

(1) nature and extent of the hazardous substance or petroleum is adequately characterized under the voluntary remediation work plan, considering the remediation objectives developed under this section; and

(2) the level of the hazardous substance or petroleum is demonstrated to be below:

> (A) background levels of the hazardous substances and petroleum that occur naturally on the site; or

> (B) the risk based levels developed under subsection (d);

additional action is not necessary to protect human health or the environment.

(d) Risk based remediation objectives shall be based on one (1) of the following:

(1) Levels of hazardous substances and petroleum calculated by the department using standard equations and default values for particular hazardous substances or petroleum.

(2) Levels of hazardous substances and petroleum calculated using site specific data for the default values in the department's standard equations.

(3) Levels of hazardous substances and petroleum developed based on site specific risk assessments that take into account site specific factors, including remedial measures, restrictive covenants, and environmental restrictive ordinances that:

> (A) manage risk; and

> (B) control completed or potential exposure pathways.

(e) The department shall consider and give effect to restrictive covenants and environmental restrictive ordinances in evaluating risk based remediation proposals.

On December 7, 2009, IDEM issued an "Interim Implementation Document" noting that the statutory amendments changed the remediation objectives IDEM is required to consider. IDEM interpreted the amendments to mean that IDEM is required to consider risk-based remediation objectives that manage risk and control completed or potential exposure pathways. IDEM stated that the objective of its risk-based policy is "to assure that all sites are mitigated through *risk assessment* procedures to assure no unacceptable risk or hazard to human health or the environment, or through *risk management* measures to assure no unacceptable exposures." *Joint Appendix of Appellants Vol. XIV* at 168 (emphasis in original). IDEM explained that it was working on a revised technical guide but, noting such "will take some time," directed IDEM staff to use the Interim Implementation Document together with the RISC guidance document. *Id*. at 165.

## *RCG*

In response to HEA 1162, IDEM substantially revised RISC and renamed it the Remediation Closure Guide (RCG). The RCG went into effect in March 2012. Like RISC, the RCG is a non-rule, policy document that does not have the force of law but is intended solely as guidance. Indeed, it expressly provides that "if it conflicts with . . . rules or laws, the rules or laws shall control." *Joint Appendix of Appellants Vol. XIII* at 184.

[16]     The RCG set out several approaches to investigation and risk-based closure of contaminated sites.[9]  The RCG established that "[t]he objective of a risk-based approach is to define an environmental concentration that corresponds to an acceptable level of risk to persons who may undergo exposure to a particular chemical." *Id*. at 196.  An important consideration under the risk-based approach is whether exposure pathways may be controlled by risk management practices, including such things as vapor mitigation systems or environmental restrictive covenants (ERCs).

### *Soil Contamination*

[17]     In 2008, before the passage of HEA 1162 and while RISC remained the technical guide for closure, Quality Environmental Professionals, Inc. (QEPI) submitted a Soil Remediation Completion Report (SRCR) to the City.  The report noted that the City excavated nearly 37,000 tons of soil to a depth of nearly seventeen feet below ground surface and acknowledged that even after such excavation, impacts of PCE and TCE were still present at discrete locations at concentrations exceeding IDCLs.  Because of such, QEPI calculated PEC values for the Ertel Site and determined that such values were below RISC IDCLs and therefore, the Ertel Site "meets the requirements for surface and subsurface soil closure under RISC default guidance." *Joint Appendix of Appellants Vol. XVII* at 176.  QEPI also opined that given the

---

[9] A companion manual, the Remediation Program Guide (RPG), also provides guidance related to specific regulatory programs.  The RPG was not submitted during the proceedings before the OEA.

location and redevelopment nature of the property, the "residual impacts do not pose an ongoing threat to the property." *Id*. at 186. The City submitted the SRCR to IDEM in 2008.

[18] An IDEM project manager who oversaw the soil remediation at the Ertel Site testified that after he reviewed the SRCR, he believed the soil at the Ertel Site had been adequately remediated. Further, a geologist for IDEM reviewed the SRCR and concluded that the PEC calculations for soil contaminants of concern were accurate and verified that such calculations were below respective RISC IDCLs. IDEM issued a comment letter on September 16, 2008, noting as much. IDEM further commented that the excavated areas of the Ertel Site were to be covered by concrete. Although acknowledging that residual soil contamination existed on the Ertel Site, IDEM concluded that such "does not present a risk of exposure at this time." *Joint Appendix of Appellants Vol. XX* at 67. After receiving IDEM's comment letter, the City moved forward "under the impression" that soil remediation was complete. *Joint Appendix of Appellants Vol. VIII* a 122. IDEM likewise moved forward without further concern for soil contamination.

*Groundwater Contamination*

[19] Following the soil excavation, the City installed permanent wells and implemented groundwater monitoring at the Ertel Site during the first quarter of 2008 and continued with such on a quarterly basis through 2009. The City also conducted two additional sampling events in July and October 2010. At

IDEM's request, the City conducted ground water monitoring again in 2012 to update the data for the Ertel Site.

[20] On May 30, 2012, the City submitted a site status update for the Ertel Site setting forth its groundwater monitoring data since 2008 and addressing the new RCG considerations for risk-based objectives, including exposure pathways. While acknowledging that the results of the most recent groundwater sampling event indicated impacts exceeding IDCLs, the City asserted that the concentrations established a declining trend of contaminants flowing from the Ertel Site as the levels were "either below or similar to those historically encountered at the site." *Joint Appendix of Appellants Vol. XXIV* at 96. The City submitted:

> Based on the results of the most recent groundwater sampling event and after evaluation of the sampling results with respect to historic sampling data, it appears that the soil remediation conducted at the [Ertel S]ite has been effective in mitigating migration of impacts off-site and downgradient from the [Ertel S]ite.

*Id.* The City further addressed the risk associated with such, noting that "[o]ff-site migration of impacts from the [Ertel S]ite does not appear to pose a continual impact to groundwater." *Id.*

[21] The City also addressed the risk of vapor intrusion, noting that Major Tool included in construction of its facility on the Ertel Site an extensive vapor mitigation system. Because no vapor impacts in excess of IDEM closure criteria had been encountered and given that the active vents of the vapor

mitigation system were no longer in use, the City asserted that vapor intrusion issues had been "successfully mitigated and do not appear to pose a threat to human health." *Id*. at 97. Based on its assessment, the City formally requested that IDEM issue an NFA Letter. After review, IDEM did not issue an NFA Letter, but rather requested additional information regarding the City's risk assessment and evaluation of exposure pathways.

[22] On October 15, 2012, the City submitted an extended "Exposure Pathway Risk Analysis" to IDEM to augment the May 30, 2012 site status update. The City opined that "[p]otential exposure pathways do not present a threat to human health and the environment and any residual impacts remaining can be addressed through the use of an ERC." *Joint Appendix of Appellants Vol. XXIV* at 115. In support thereof, the City pointed out: (1) no wetlands existed on the Ertel Site, (2) the Ertel Site was not within a Wellhead Protection Area, (3) the impacted soil had been removed and the Ertel Site was subsequently redeveloped and covered with concrete, (4) the Ertel Site is supplied with municipal water by the City of Indianapolis, (5) there are no local residential potable water wells within a one-mile radius of the Ertel Site, and (6) impacts to groundwater had been shown to be stable or decreasing since completion of soil remediation. While noting that impacts exceeding IDCLs had been recorded at a facility located directly downgradient of the Ertel Site, the City asserted that such was the result of an on-site source independent of potential migratory impacts from the Ertel Site.

[23] On November 19, 2012, IDEM issued an NFA Letter concluding that no further action was required to address contamination at the Ertel Site. In making this determination, IDEM noted that it reviewed the following reports and information:

- *Exposure Pathway Risk Analysis and No Further Action Request*, submitted by Heartland Environmental Associates, Inc. (Heartland) on October 15, 2012;
- *Site Status Update*, submitted by Heartland and dated May 30, 2012;
- *Final VI System Sampling Report*, submitted by [QEPI] and dated December 2010; and
- various groundwater monitoring reports from March 2008 through April 2010.

*Joint Appendix of Appellants Vol. III* at 12.

[24] With regard to soil contamination at the Ertel Site, IDEM noted the extensive removal of contaminated soil, the post-excavation soil sampling that showed remaining soil contaminants were within IDEM RISC parameters, and that Major Tool's construction of a new manufacturing facility on the Ertel Site "effectively capped the [Ertel] Site and eliminated any potential direct contact soil exposure risk." *Id*. at 19. As to groundwater contamination, IDEM noted that monitoring from 2008 through 2012 showed that "chlorinated hydrocarbon concentrations were exhibiting a declining trend at all wells and all ground water depths." *Id*. IDEM acknowledged that during the most recent groundwater monitoring event there were impacts exceeding IDCLs but noted that no potable wells existed within one mile of the Ertel Site and that the Ertel Site was not located in a wellhead protection area. IDEM also noted that to

manage any potential exposure risk, an ERC[10] had been recorded with the Ertel Site.

[25] IDEM concluded that "[b]ased on the information provided, as well as current industrial site use, no further action is required at this time" as there was no longer any potential direct contact soil exposure risk, no vapor inhalation pathway, and no further migration of contaminants into the groundwater at the Ertel Site. *Joint Appendix of Appellants Vol. III* at 14. At that time, $846,000 remained in the escrow account. The parties do not dispute that these funds were surrendered to the City.

[26] On January 29, 2013, Moran, as "a downgradient property owner," filed a petition for administrative review with the OEA (OEA I) challenging IDEM's issuance of the NFA Letter.[11] *Id*. at 2. Moran requested that the NFA Letter be revoked because IDEM failed to fully characterize contamination arising from the Ertel Site in that it did not consider offsite impacts. In response, the City and IDEM argued that the NFA Letter was properly issued based upon RISC

[10] The ERC prohibited residential use of the Ertel Site, installation of potable wells for ground water extraction and consumption, and excavation of soil without IDEM's prior approval. The ERC also required the continued operation and maintenance of the sub-slab vapor mitigation system.

[11] Moran also sought to intervene in the civil action between IDEM and Ertel. The trial court initially denied the motion to intervene, but on appeal this court reversed, finding that Moran "had an immediate and direct interest in the proceedings" and that the distribution of funds remaining in the escrow account to the City would impede protection of its property in that Moran was claiming contamination on its property emanating from the Ertel Site not addressed by IDEM prior to issuing the NFA Letter for the Ertel Site. *See Moran Elec. Serv., Inc. v. Ind. Dep't of Envtl. Mgmt.*, 8 N.E.3d 698, 708 (Ind. Ct. App. 2014), *aff'd on reh'g* 13 N.E.3d 906. This court also determined that under the primary jurisdiction doctrine, the action before the trial court should be stayed until the administrative proceedings before the OEA became final. *Id*. at 706.

guidance and a risk analysis under the RCG.  The City and IDEM also argued that Moran did not have standing to challenge issuance of the NFA Letter because Moran was not aggrieved or adversely affected.

[27]   Over the next several years, the parties conducted extensive discovery, resulting in a voluminous record that was presented to the OEA during a final hearing on Moran's objection held October 24 through October 27, 2016.  Before the OEA issued its decision, Moran filed a second petition for administrative review with the OEA on December 30, 2016 (OEA II), again requesting review and revocation of IDEM's issuance of the NFA Letter regarding the Ertel Site.[12]  In OEA II, Moran relied upon data it collected after the NFA letter was issued, which Moran claimed showed TCE contamination at the Ertel Site at levels far greater than the levels IDEM relied upon to justify issuance of the NFA Letter.  Moran asserted that recently collected data also suggested that contamination at downgradient properties had the same isotopic signature as the contamination found on the Ertel Site, thus suggesting that contamination was still emanating therefrom.  Moran also argued for the first time that IDEM failed to apply the cleanup standards set forth in the Agreed Order and that by applying different standards, IDEM violated state and federal law.

---

[12] In its second petition, Moran stated that it was "being sued in state and federal court for environmental response costs that were and are necessitated by contamination that migrated, and is migrating from the [Ertel S]ite."  *Joint Appendix of Appellants Vol. XII* at 3.  Moran also stated that it had "incurred substantial costs to investigate the nature and extent of contamination originating from and migrating to the former Moran [Site]."  *Id*.

On April 7, 2017, the OEA issued a fourteen-page final order setting out its findings of fact and conclusions of law in OEA I. The OEA detailed the history of the Ertel Site, the remediation efforts undertaken by the City, and the sampling data collected thereafter. The OEA found that IDEM properly relied upon RISC and the RCG, thereby rejecting Moran's argument that pursuant to the terms of the Agreed Order, IDEM was strictly limited to following the RISC default approach. Specifically, the OEA concluded:

> IDEM relied on RISC and RCG to determine if the Ertel Site qualified for no further action status. [Moran] argues that the use of the RCG was improper as the Settlement Agreement and the [Agreed Order] indicated that the NFA should be issued using the RISC guidance. However, the RCG guidance was in effect when the NFA Letter was issued and at the time IDEM was analyzing whether NFA was appropriate. The [Agreed Order] contemplated that the [Ertel] Site could be closed using RISC. This would necessitate using the RCG. Also, both RISC and RCG are non-rule policy documents and do not have the force of law. Further, the use of the RCG is consistent with the statutory authority . . . in effect when the NFA Letter was issued. So, the applicable statutes and rules would clearly have precedent in this instance.

*Joint Appendix of Appellants Vol. II* at 63.

With regard to soil contamination, the OEA acknowledged that there were individual sidewall and bottom soil samples that showed contaminants of concern at levels exceeding RISC IDCLs. The OEA, however, accepted expert testimony that these individual samples were "indicative of ground water contamination, not soil contamination." *Id*. The OEA further found that PEC

calculations, which were shown to be below IDCLs, were "an appropriate line of evidence for closure under RISC" and "consistent with the law." *Id*. at 59, 64. Based on its de novo review of the evidence and the fact that Moran did not present any evidence challenging the PEC calculation relied upon by IDEM,[13] the OEA concluded that although it was "possible" that contaminants of concern remained on the Ertel Site, "the weight of the evidence" demonstrated that the remedial goals for soil contamination had been met. *Id*.

[30]     With regard to groundwater contamination and migration of contaminants of concern from the Ertel Site to the Moran Site, the OEA agreed with IDEM that any contamination flowing from the Ertel Site commingled with more significant contamination that directly occurred on the Moran Site itself[14] and that Moran was "a responsible party" with regard to such contamination. *Id*. at 55. The OEA found that "any residual contaminants migrating off of the Ertel [S]ite would be remediated or contained by [Moran] without additional cost to them, when [Moran] remediated or contained [its] own contributions to the co-mingled plume." *Id*. at 60. The OEA also agreed with IDEM's assessment of groundwater exposure pathways. Based on its de novo review of the data, the OEA concluded that IDEM properly determined that "the ground water plume

---

[13] Moran's own expert admitted that the PEC calculation was accurate and below IDCLs.

[14] In support, the OEA noted that "several witnesses testified that the ground water contamination downgradient of the Moran [Site] were orders of magnitude above the amount of ground water contamination migrating from the upgradient Ertel Site onto the Moran [Site]." *Joint Appendix of Appellants Vol. II* at 65. This evidence suggested that any contamination emanating from the Ertel Site was less than the contamination existing on the Moran Site.

coming from [the] Ertel [Site] was stable; that the exposure pathways for ground water were incomplete; and that the levels emanating from the Ertel [S]ite are at an acceptable site-specific risk level." *Id*. at 66.

[31]     The OEA also concluded that "vapor intrusion issues downgradient of the Ertel [Site]" were only minimally caused by contamination on the Ertel Site. *Id*. at 65. In closing, the OEA concluded that IDEM "was consistent in how it applied RISC and RCG and the law" and that "the Ertel Site qualified for NFA status." *Id*. at 66.

[32]     On May 4, 2017, Moran filed a petition for judicial review of OEA I. On July 24, 2017, the trial court granted an agreed motion to stay the proceedings pending resolution of OEA II.

[33]     The OEA held a final hearing on the OEA II matter on August 24-25, 2017. On January 17, 2018, the OEA issued extensive findings of fact and conclusions of law denying OEA II. The OEA acknowledged Moran's new data but noted that the method used to obtain such (i.e., grab samples)[15] rendered it "inadequate for compliance or closure purposes because they only show one sampling event in one location and, therefore, are insufficient to show whether

---

[15] Moran submitted data from vertical aquifer profiling samples, which are also knows as "grab" groundwater samples. The OEA noted that "[g]rab groundwater samples are useful for screening, investigative or delineation purposes," *Joint Appendix of Appellants Vol. II* at 71. The OEA also noted that split samples taken by another entity at the same time and location as Moran's samples "resulted in a few high relative percent difference values," which "made IDEM question the reproducibility of [Moran's] samples." *Id*.

a plume is stable or declining over time." *Id*. at 71. In contrast to the grab samples, the OEA considered data from the permanent wells on the Ertel Site, which the OEA found showed that contaminants of concern were stable or declining.

[34] Having considered Moran's arguments in OEA II, the OEA concluded as follows:

> 5. There is sufficient evidence to support a conclusion that releases occurred on the Ertel . . . and Moran site[s]. There is also no question that contamination was left on the Ertel [S]ite. Moran has presented sufficient evidence to call into question whether upgradient contamination from Ertel or [another upgradient property] has migrated onto the Moran [S]ite. But the question before the Court is not whether there is contamination migrating from Ertel to Moran, but whether IDEM properly applied the RISC policy in evaluating the request for NFA status for Ertel, even in light of the new data collected by Moran. So, a conclusion that contamination is migrating does not automatically lead to a conclusion that IDEM erred in issuing the NFA [Letter] or refusing Moran's request to revoke the NFA [Letter] based on the data collected by Moran afterwards. The RISC policy does not require a cleanup to zero. RISC considers whether each exposure pathway poses a threat to human health or the environment. In this case, the sites are part of a larger industrial area. Each possible exposure pathway was analyzed under the rules and guidance documents and IDEM determined that, after the remediation undertaken at the Ertel [S]ite, none of the pathways posed a hazard to human health or the environment.

> 6. The three exposure pathways analyzed for Ertel were direct soil contact, ground water and vapor intrusion.

7. The soil contamination was addressed by (1) excavation of the contaminated soil; (2) restrictive covenants on use of the property, including but not limited to the continued operation of the sub-slab vapor extraction mitigation system; and (3) potential exposure analysis addressed. On this basis, IDEM determined that there was no exposure pathway for direct soil contact.

8. Drinking water in this area is supplied by the City of Indianapolis so there is no exposure pathway for ground water.

9. Vapor intrusion is not likely in this area because there are few buildings in the affected area and there are vapor intrusion mitigation devices in those buildings that might be affected.

10. While Moran has provided data that indicates high concentrations of TCE and PCE . . . , this data was based on "grab" sampling. This type of sample does not carry the same weight as samples taken from permanent wells over a long period of time. So, the preponderance of the evidence weighs in favor of IDEM's decision. These grab groundwater samples are not comparable to the data from the permanent wells . . . and they presented insufficient information to revisit the determination as to whether the plume emanating from the Ertel Site was stable or declining.

11. IDEM was evaluating [the Ertel Site] to determine if there were any open exposure pathways. Moran's evidence, while it shows contamination still exists, failed to address the risk posed by the remaining contamination. Moran has presented no evidence that a completed exposure pathway exists at the Ertel Site or that the risk-based approach used to close the Ertel Site is no longer effective or that it otherwise presents a risk to human health or the environment.

*Id.* at 77-78.  Moran timely sought judicial review of OEA II.  Pursuant to the parties' request, Moran's petitions for judicial review were consolidated.[16]

[35]  The trial court heard argument on Moran's petitions on August 14, 2018.  On November 20, 2018, the trial court issued its Order on Petition for Judicial Review.  The trial court sided with Moran, concluding that "the OEA erred in concluding applicable statutes and rules would have precedent over the contract terms negotiated by the parties in the Agreed Order." *Id.* at 47.  In so concluding, the trial court relied on a single comment in IDEM's RPG, which presumably[17] states that "IDEM must follow state law, unless the site is governed by an agreement, such as a Voluntary Remediation Agreement or **Agreed Order**." *Id.* at 49 (emphasis in original).  The court continued, "The [Ertel] Site was governed by an Agreed Order which set out specific remedial goals.  One party to an agreement cannot unilaterally change remediation terms after an agreement has been signed by the parties and entered by the Court." *Id.*  The trial court concluded that "the language of the Agreed Order must control" and therefore reversed the OEA's decision upholding IDEM's issuance

---

[16] The trial court *sua sponte* consolidated Moran's petitions for judicial review with IDEM's civil action against Ertel in which Moran was permitted to intervene.

[17] We say presumably because the RPG was not part of the record before the OEA.  According to IDEM, the RPG is part of the record in the civil action it filed against Ertel.  IDEM asserts, however, that the trial court improperly consolidated this action pertaining to review of the OEA's decision under AOPA with the civil action.  Thus, IDEM maintains that the trial court erroneously relied upon the RPG as it was not part of the agency record.

of the NFA Letter for the Ertel Site. *Id*. The City and IDEM now appeal.

Additional facts will be provided as necessary.

# Discussion & Decision

## *Standard of Review*

[36] Judicial review of an administrative decision is limited under the Administrative Orders and Procedures Act (AOPA). *Huffman v. Office of Envtl. Adjudication*, 811 N.E.2d 806, 809 (Ind. 2004). We give deference to the expertise of the administrative body, and will reverse the agency's decision only if it is

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence.

Ind. Code § 4-21.5-5-14(d). "A decision is arbitrary and capricious when it is made without any consideration of the facts and lacks any basis that may lead a reasonable person to make the same decision made by the administrative agency." *Ind. Dep't of Envtl. Mgmt. v. Schnippel Constr., Inc.*, 778 N.E.2d 407, 412 (Ind. Ct. App. 2002), *trans. denied* (2003). The party seeking judicial review bears the burden of proving that the agency action is invalid for one of the five reasons. *Jay Classroom Teachers Ass'n v. Jay Sch. Corp.*, 55 N.E.3d 813, 816 (Ind. 2016).

[37] "When reviewing an administrative agency's decision, appellate courts stand in the same position as the trial court." *Pendleton v. McCarty*, 747 N.E.2d 56, 61 (Ind. Ct. App. 2001) (*citing Amoco Oil Co. v. Comm'r of Labor*, 726 N.E.2d 869, 872 (Ind. Ct. App. 2000)). This court may not substitute its judgment on factual matters for that of the agency, and we are bound by the agency's findings of fact if they are supported by substantial evidence. *See Whirlpool Corp. v. Vanderburgh Cty.-City of Evansville Human Relations Comm'n*, 875 N.E.2d 751, 759 (Ind. Ct. App. 2007). On review, we are prohibited from reweighing the evidence or judging the credibility of witnesses. *Amoco*, 726 N.E.2d at 873.

[38] While reviewing courts must accept the agency's findings of fact if supported by substantial evidence, no such deference need be accorded an agency's conclusions of law, as the law is the province of the judiciary. *Id*. However, "[a]n interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself." *Moriarity v. Ind. Dep't of Natural Res.*, 113 N.E.3d 614, 619 (Ind. 2019) (quoting *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind. 2000)); *see also Hoosier Outdoor Advertising Corp. v. RBL Mgmt., Inc.*, 844 N.E.2d 157, 163 (Ind. Ct. App. 2006), *trans. denied*.

[39] Here, the agency action being challenged is IDEM's issuance of the NFA Letter and the OEA's affirmance thereof. The dispute on appeal concerns the proper remediation objectives that IDEM was to use in deciding whether the Ertel Site qualified for closure.

[40]     We begin with the language of the Agreed Order, which set out the remedial goals for the Ertel Site as follows:

> (1) reducing the on-site Contaminants of concern to industrial default RISC[ ] cleanup levels; and (2) reducing Contaminants of concern flowing off-site in the groundwater to at or below MCLs[] or to a site specific risk level, as defined by IDEM RISC guidance, to be protective of human health and the environment and of the City's water supply.

*Joint Appendix of Appellants Vol. II* at 97. Moran argues that this provision set "specific levels to which contaminants must be reduced in soil and groundwater on the Ertel Site" and mandated that IDEM follow the default approach under RISC. *Appellee's Brief* at 23. Specifically, Moran argues that IDEM could not consider the PEC calculations as to soil contamination because such was a nondefault method under RISC. Moran also argues that IDEM could not consider other risk-based objectives found under the RISC nondefault method or the RCG because the Agreed Order required that the "specific levels" be attained before closure could occur. The City and IDEM argue that the PEC calculation and risk-based objectives (including an assessment of risk associated with exposure pathways) under the RCG technical guidance were properly considered in concluding that the Ertel Site qualified for closure.

[41]     In reviewing these same arguments, the OEA acknowledged that the Agreed Order "contemplated that the Site could be closed using RISC." *Joint Appendix of Appellants Vol. II* at 63. However, noting that RISC was replaced with the RCG and that the RCG was in effect when the NFA Letter was issued, the

OEA found that the Agreed Order's reference to RISC "would necessitate using the RCG." *Id*. The OEA also noted that RISC and the RCG were non-rule policy documents that do not have the force of law.[18] Thus, the OEA found that the statutes in effect when the NFA Letter was issued took precedence over the language in the Agreed Order that referenced only RISC guidance. The OEA therefore concluded that IDEM properly relied on risk-based remediation standards in deciding to issue the NFA Letter.

[42] In reversing the OEA's order, the trial court relied upon a single statement from IDEM's RPG, namely that "'IDEM must follow state law, unless the site is governed by an agreement, such as a Voluntary Remediation Agreement or **Agreed Order**.'" *Id*. at 49 (quoting "(Remediation Program Guide, February 2012, With Corrections Up to July 9, 2012, Indiana Department of Environmental Management, p. 10, *emphasis added*.)). Based on this statement out of the RPG, the trial court concluded that "the language of the Agreed Order must control." *Id*.

[43] The trial court's reliance on the RPG was erroneous for several reasons. First, as pointed out by IDEM, the RPG was not part of the review proceedings before the OEA and therefore such was not part of the agency record available

---

[18] Indeed, we note that both documents expressly caution that if any provisions therein conflict with statutes, the statutes control. RISC expressly provided: "If a conflict exists between RISC and state or federal rules or statutes, the rules and statutes will prevail." *Joint Appendix of Appellants Vol. XXVII* at 12. The RCG also contains a similar disclaimer, stating that "[i]t is intended solely as guidance and shall be used in conjunction with applicable rules or laws" and that "if it conflicts with these rules or laws, the rules or laws shall control." *Joint Appendix of Appellants Vol. XIII* at 184.

for the trial court's review. *See, e.g., Dev. Servs. Alternatives, Inc. v. Ind. Family & Social Servs. Admin.*, 915 N.E.2d 169, 176 (Ind. Ct. App. 2009) (noting that judicial review of disputed issues of fact must be confined to the agency record for the agency action), *trans. denied*. The RPG is also not in the record on appeal.[19] Second, even if the RPG was in the record, the legislature's mandate that IDEM consider risk-based objectives for site closure in conjunction with its expressed intent that such objectives be applied retroactively cannot be ignored. *See* I.C. § 13-25-5-8.5(a) (providing that statutory changes "apply to a site regardless of whether the site was entered into the voluntary remediation program before July 1, 2009, or after June 30, 2009"). Third, the RPG is a non-rule policy document that does not have the effect of law. A statement in the RPG cannot therefore overrule the clear intent of the legislature with regard to closure of environmental sites.

[44]   Here, the parties to the Agreed Order (which, we note, does not include Moran) referenced use of RISC technical guidance, which was the only technical guidance in existence at the time the Agreed Order was entered, for defining the contamination level acceptable for closure of the Ertel Site. While the Agreed Order referenced "default RISC cleanup levels" and "IDEM RISC guidance," it did not specify whether the default or nondefault method should be employed. *Joint Appendix of Appellants Vol. II*. at 97. Thus, contrary to Moran's argument,

---

[19] According to IDEM, the RPG was admitted as part of the proceedings in IDEM's civil action against Ertel. IDEM argues that the trial court erred when it *sua sponte* consolidated the civil action with this review action under AOPA and thus, the RPG was not properly before trial court.

the Agreed Order did not limit the method of compliance to the *default* method under RISC, i.e., a strict comparison of TCE and PCE values to IDCLs. Use of the PEC calculation, a valid, *nondefault* method of site closure under RISC, did not therefore contravene the terms of the Agreed Order. *See Ind. Dept. of Envtl. Mgmt. v. Raybestos Products Co.*, 897 N.E.2d 469, 477 (holding that "the public interest is not served by enforcing promises that were never made" and thus IDEM did not violate the terms of an agreed order by communicating with the EPA when the agreed order did not "purport to forbid" such). In accordance with RISC guidance, IDEM presented evidence that the PEC calculation for contaminants of concern at the Ertel Site were less than IDCLs and such served as the basis for IDEM's conclusion that soil contamination at the Ertel Site had been adequately remediated. In this vein, we also note that soil remediation was considered complete years before the Agreed Order was entered and the parties to the Agreed Order were clearly aware that IDEM used a nondefault method (i.e., comparison of the PEC calculation with IDCLs) in finding that no further soil remediation at the Ertel Site was required.

[45] We next turn to the statutory amendments made by the legislature. We agree with the OEA's assessment of the facts and timing of events as they pertain to interpretation of the Agreed Order. At the time the Agreed Order was entered, RISC was the technical guidance document followed by IDEM. In the time between the Agreed Order and issuance of the NFA Letter, IDEM replaced RISC with the RCG, which provided technical guidance for site closure that was consistent with the new statutory requirements. The RCG became

effective after the Agreed Order was entered and was the technical guidance document being utilized by IDEM for site closure when the City asked IDEM to evaluate the Ertel Site for no further action status. In light of the evolving environmental policies of this State, the OEA determined that IDEM properly considered risk-based objectives and its reliance on the RCG was proper as such was consistent with the statutory mandate. Moran has not established that application of the RCG and risk-based objectives was arbitrary and capricious. We therefore find no error in the OEA's review of IDEM's issuance of the NFA Letter.

[46] Moran has also not established that the OEA's refusal to set aside the NFA Letter based on the new sampling data Moran submitted was arbitrary and capricious. The OEA acknowledged Moran's data, but found that such was unreliable, did not undermine the City's data from the time of closure, and did not establish a completed exposure pathway for soil or groundwater contamination or vapor intrusion.[20] Moran does not challenge these factual findings and we will not substitute our judgment for that of the administrative agency.

[47] In sum, we conclude that the determination as to the proper remediation standards to be applied in deciding whether the Ertel Site qualified for no

---

[20] IDEM and the City also argue that Moran is not an aggrieved or adversely affected party for purposes of seeking review under AOPA. Given our conclusion that IDEM properly issued the NFA Letter, we need not address the parties' arguments in this regard.

further action status was not arbitrary and capricious and was in accordance with the law in effect when the NFA Letter was issued. IDEM's issuance of the NFA Letter was not in error. We therefore reverse the trial court's order remanding the matter to IDEM.

[48]    Judgment reversed.

Brown, J. and Tavitas, J., concur.